[No. D013222. Fourth Dist., Div. One. May 22, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
GOLDWIRE ALICHIA JACKSON et al., Defendants and Appellants.

## Counsel

Robert F. Gusky, Barbara A. Smith and Jeffrey J. Stuetz, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Keith I. Motley and Laura Whitcomb Halgren, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**WIENER, Acting P. J.**—Defendants Goldwire Alichia Jackson and Subodai J. Davis appeal the judgment entered on jury verdicts convicting them of robbery in the first degree. (Pen. Code, § 212.5, subd. (a).)[1] Both argue that the undisputed facts indicate they are guilty, at most, of second degree robbery. Jackson also contends the trial court erred in excluding certain proffered evidence. As we shall explain, we reject their contentions and affirm.

### Factual and Procedural Background

In June 1990, Darius Horton and the eventual victim, Jeffrey Johnson, obtained a ride from the Navy base with two of Horton's friends, defendants Davis and Jackson. The group drove to a house where Davis rented a room. Another man, Jake Jones, was at the apartment when they arrived. The house contained a communal kitchen, a common living room area and three locked bedrooms. Davis was in the process of moving out but had not yet done so.

After drinking and talking for some time, everyone began to leave the house and head back to the car. Davis asked Johnson and Horton to return to

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

the house, and the three men went into Davis's bedroom. Following a short conversation, Davis struck Johnson on the bridge of the nose with a beer bottle. Johnson bent over with blood running off his nose and noticed Jackson coming towards him with a rifle in his hand. Davis and Jackson demanded Johnson give them his money. Johnson reached into his pocket to get his wallet, and Davis helped pull it out to begin counting the money. Jackson then fired a shot from the rifle, hitting Johnson in the leg.

Davis, Jackson, Horton and Jones then drove off, taking Johnson's money, driver's license and military identification. The police found Davis, Jones and Jackson at a nearby hotel.

## DISCUSSION

### I

Both Jackson and Davis argue they could not properly be convicted of first degree residential robbery.

### A

Section 212.5 provides in relevant part, "[E]very robbery which is perpetrated in an inhabited dwelling house, . . . or the inhabited portion of any other building, is robbery of the first degree." (§ 212.5, subd. (a).) An "inhabited dwelling house" means a structure where people ordinarily live and which is currently being used for dwelling purposes. (*People* v. *Guthrie* (1983) 144 Cal.App.3d 832, 838, 848 [193 Cal.Rptr. 54] [interpreting identical language in the section 460 definition of first degree burglary].) "A place is an inhabited dwelling if a person with possessory rights uses the place as sleeping quarters intending to [do] so in the future." (*People* v. *Fleetwood* (1985) 171 Cal.App.3d 982, 987 [217 Cal.Rptr. 612].)

Jackson and Davis contend the evidence was insufficient to sustain their convictions for first degree robbery because Davis's bedroom, in which the robbery occurred, was not currently inhabited at the time of the robbery. Relying on *People* v. *Cardona* (1983) 142 Cal.App.3d 481 [191 Cal.Rptr. 109], they assert that Davis's possessions were moved from the house to his vehicle prior to the robbery, and therefore no evidence supported the conclusion that Davis currently or in the future intended to use the house for habitation. We disagree.

In *Cardona,* the previous residents of a burglarized house had moved into their new home the night before the burglary but had not yet finished

removing all their belongings. The residents admitted, however, that they never again intended to occupy their previous house as a residence. (142 Cal.App.3d at p. 482.) This court held that first degree burglary is a crime against habitation. Therefore, when residents move out of a house with no intent to again use the house as sleeping quarters, the house is considered "uninhabited." (*Id.* at p. 483.)

Where a dwelling was previously inhabited, it does not become "uninhabited" within the meaning of *Cardona* until the residents leave never again intending to return to use the dwelling as sleeping quarters. Here, in contrast, Davis may have been in the process of moving out, but had not yet moved out at the time of the robbery. The record shows that just prior to the robbery, the five men were sitting in a common area drinking and talking. Davis invited Johnson into his bedroom in order to commit the robbery.

It is clear that Davis was still presently using the house, and in particular his bedroom, at the time of the robbery. Under defendants' theory, a dwelling would become "uninhabited" as soon as the occupants awoke on their last day in a residence. The distinction between first and second degree burglary must turn on more substantive considerations. When residents vacate a dwelling without intending to sleep there again, but leave personal property to pick up later, the character of the use arguably changes from a residence to a storage facility. Here, because Davis had never vacated the premises, the character of the use never changed and the bedroom remained "inhabited" within the meaning of section 212.5.

In any event, whatever the status of Davis's bedroom, it does not appear to be disputed that the other bedrooms in the house remained in use even after Davis's departure, and thus the house was an "inhabited dwelling" within the meaning of the statute. Where the principal use of a building is as a single residence and that residence is inhabited, the character of the use of the particular room in the building where the robbery occurs is irrelevant.

B

 Even accepting that the room and/or house was "inhabited," Davis relies on the legislative intent underlying the enactment of the first degree residential robbery statute to argue that a residential robbery cannot be committed unless the robber's entry of the residence constituted a residential burglary. Here, Davis claims, because he cannot be convicted of burglarizing his own residence (see *People* v. *Gauze* (1975) 15 Cal.3d 709 [125 Cal.Rptr. 773, 542 P.2d 1365]), he similarly is not guilty of first degree robbery.

Focusing on legislative intent poses particular problems in this area. By using identical language in the residential robbery and residential burglary

statutes, it seems reasonable to assume the Legislature intended the two statutes to be interpreted similarly. Indeed, the enactment of the residential robbery statute appears to have been motivated by a legislative concern that residential burglary (the mere entry of a residence, even if unoccupied) was punished more severely than a robbery which occurred within the residence. (See *People* v. *Fleetwood, supra,* 171 Cal.App.3d at p. 987.) Yet transfer of the concept of "habitation" from the burglary to the robbery context creates some difficulty. Burglary is a crime against a person's rights of possession in a building. (*People* v. *Gauze, supra,* 15 Cal.3d at p. 714.) Burglary of an "inhabited" dwelling house is punished more severely because of the risk that occupants will be harmed. (See *People* v. *Guthrie, supra,* 144 Cal.App.3d at p. 847.) In contrast, robbery is principally a crime against the person, not the possessory interest. (*People* v. *Ramos* (1982) 30 Cal.3d 553, 587, 589 [180 Cal.Rptr. 266, 639 P.2d 908].) By definition, a robbery cannot be committed inside a dwelling unless the dwelling is occupied. Section 212.5, however, by requiring that the robbery take place inside an "inhabited" dwelling, necessarily implies that robberies can take place inside occupied but uninhabited dwellings which are not deserving of increased punishment. We assume, for instance, that if a real estate agent waiting to show a vacant house was robbed inside that house, the crime would be only second degree robbery. (See *People* v. *Cardona, supra,* 142 Cal.App.3d 481 [vacated house not "inhabited"].)[2]

At least two possible purposes suggest themselves for the Legislature's decision to enact a residential robbery statute. First, it could be asserted that potential robbery victims are more vulnerable inside dwellings because they are less visible and have less access to assistance. Were this the theory underlying section 212.5, however, there would be no need to require that the dwelling be "inhabited" because the robbery victim is just as vulnerable even where no identifiable person has the right and intent to use the dwelling as sleeping quarters.

Alternatively, it may be that the Legislature had in mind a similar but somewhat narrower rationale. A person inside a private residence, whether it be their own or that of an acquaintance, feels a sense of privacy and security not felt when outside or in a semipublic structure. The Legislature could have reasoned that people generally let their guard down inside a residence, providing the robber with the advantages of shock and surprise which may incapacitate the victim(s). This rationale focuses not on the inability of

---

[2]Perhaps first degree burglary would be better defined as the burglary of a dwelling house either occupied *or* inhabited. Were this the case, symmetry would be maintained if first degree robbery were then defined simply as a robbery committed inside a dwelling house, since the dwelling would necessarily be "occupied" by the victim at the time of the robbery.

outsiders to observe and assist but on the psychological vulnerability of the victim.

Consistent with this latter rationale, we are compelled to reject Davis's assertions that a residential burglary is a necessary predicate for a residential robbery. (See *People* v. *Alvarado* (1990) 224 Cal.App.3d 1165 [274 Cal.Rptr. 452].) From the victim's psychological standpoint, a robbery in the defendant's residence to which the victim was invited is no different from a robbery committed by some unknown third person inside a friend's house. In either case, the victim assumes an enhanced level of security and privacy which is violated by the crime.

We accordingly conclude both Davis and Jackson were properly convicted of first degree robbery.

## II

Before trial began, codefendant Davis brought a motion *in limine* to exclude evidence that he and Johnson met while serving time in the brig.[3] Codefendant Jackson did not object to the motion, and it was granted by the court.

Later, during cross-examination of Johnson, Jackson's counsel asked what his Navy status was at the time of the incident. The court then called counsel to sidebar to prohibit Jackson's counsel, in light of the *in limine* ruling, from using Johnson's "status" as a means to inform the jury that Johnson had recently been released from the brig. Jackson's counsel explained he did not intend to ask about the brig, but only wanted to show that Johnson had a lower tolerance for alcohol because he had not consumed any liquor for at least 50 days prior to the incident. When counsel admitted he did not intend to put on expert testimony regarding alcohol tolerance, however, the court refused to allow it to be argued on the basis of common knowledge.

The issue of Johnson's brig time arose again during Jackson's closing argument when his counsel stated:

"Now, we don't know how long its been since Mr. Johnson could party a little. We just know that his city clothes were locked up 50 days prior to that." The court sustained the prosecutor's objection, and at a later nonrelated sidebar conference stated:

"Just a moment. You're skating on thin ice. I didn't appreciate that comment, and I think everyone knew in that courtroom including the jury

---

[3]The *in limine* proceedings were unreported.

what you were hinting at. Now you can't have it both ways. You want a motion in limine, you get a motion in limine. But you're not going to violate it and make certain insinuations as it relates to the victim. When no one is allowed to do that, as opposed—as it relates to the defendant, that's not fair. And I'm not going to allow it."

■ Having sought admission of the evidence on one ground, Jackson now seeks to justify the introduction of testimony concerning Johnson's time in the Navy brig on the theory that his punishable conduct would impeach his credibility. Indeed, Jackson is really arguing about *different* evidence than he proffered at trial. At trial, Jackson made clear he was not inquiring about Johnson's conduct or the time he served in the brig:

"I do not intend to ask him if he was in the brig. I do intend, I think it's important, that he went 50 days prior to this without having any alcohol . . . ."

When asked about the relevance, counsel replied:

"Because he was drinking. He was drinking. The whole content was that he was intoxicated at the time. If he had been drinking on a regular basis, had a tolerance to alcohol."

The issue Jackson identified at trial was Johnson's tolerance for alcohol. Johnson's time in the brig was arguably relevant to that issue because he had been without alcohol for 50 days prior to the robbery. Now, however, Jackson asserts that Johnson's bad character was relevant to impeach his credibility. On this theory, it was not Johnson's time in the brig which Jackson wanted the jury to consider but Johnson's underlying conduct which resulted in his incarceration.

In any event, even if the evidence was the same, Jackson cannot now argue a different theory of admissibility. Evidence Code section 354 prohibits the reversal of a judgment based on the erroneous exclusion of evidence unless the complaining party made known to the trial court the "purpose" and "relevance" of the proffered evidence. Here, Jackson never argued the theory he now asserts on appeal.

Finally, even if the trial court should have admitted the evidence on the "tolerance" theory identified by Jackson at trial—an issue we do not decide —there was no prejudice. The jury knew Johnson had been drinking. Johnson testified that he purchased a six pack and two quarts of beer prior to the incident, and admitted drinking part of a can and part of a quart. In addition, Officer Darwent testified Johnson appeared to have been drinking, but was not drunk, and Jackson testified that Johnson had been drinking a

"lot" of alcohol at the apartment prior to the incident. Jackson conceded he had no expert testimony regarding the tolerance issue. It is not reasonably probable a more favorable verdict would have resulted had the jury been allowed to consider Johnson's lack of alcohol consumption for 50 days prior to the robbery. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

DISPOSITION

Judgment affirmed.

Todd, J., and Huffman, J., concurred.

A petition for a rehearing was denied June 9, 1992, and appellants' petition for review by the Supreme Court was denied August 12, 1992. Kennard, J., was of the opinion that the petition should be granted.