**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

PEDRO MARTINEZ-MARTINEZ,
    *Defendant-Appellant.*

No. 06-10015

D.C. No.
CR-05-1030-DCB

OPINION

Appeal from the United States District Court
for the District of Arizona
David C. Bury, District Judge, Presiding

Argued and Submitted
October 16, 2006—San Francisco, California

Filed November 14, 2006

Before: Pamela Ann Rymer and Sidney R. Thomas,
Circuit Judges, and Stephen G. Larson,* District Judge.

Opinion by Judge Larson

*The Honorable Stephen G. Larson, United States District Judge for the Central District of California, sitting by designation.

18517

**COUNSEL**

Roger H. Sigal, Law Offices Roger H. Sigal, Tucson, Arizona, for the defendant-appellant.

Elizabeth Berenguer, Assistant United States Attorney, Tucson, Arizona, for the plaintiff-appellee.

## OPINION

LARSON, District Judge:

Pedro Martinez-Martinez pled guilty to illegal reentry into the United States after being deported following a conviction for a felony and was sentenced to forty-six months in federal prison. This case presents the question of whether, in computing Martinez-Martinez's prison sentence, the district court erred in treating Martinez-Martinez's prior state-court conviction in Arizona for discharging a firearm at a residential structure as a "crime of violence" under United States Sentencing Guidelines ("USSG") section 2L1.2(b)(1)(A)(ii). For the reasons set forth below, we find that the district court did so err.

## I.  PROCEDURAL HISTORY

On June 28, 2005, Martinez-Martinez pled guilty to one count of unlawfully re-entering the United States after being deported following a conviction for a felony in violation of 8 U.S.C. § 1326. This was not the first time Martinez-Martinez had been found residing in this country illegally. Martinez-Martinez was deported in 2002 following a one-year state prison sentence in Arizona for discharging a firearm at a residential structure, a violation of Arizona Revised Statutes § 13-1211, and for endangerment, a violation of Arizona Revised Statutes § 13-1201. Martinez-Martinez illegally re-entered this country the following year, was detained by border patrol agents, pled guilty to violating section 1326, served eight months in federal prison, and was again deported. On April 27, 2005, a border patrol agent apprehended Martinez-Martinez in Willcox, Arizona, leading to the present charges against him.

Martinez-Martinez filed objections to the pre-sentence report, which recommended that the base offense level for his crime should be increased from eight to twenty-four for having been previously convicted of a crime of violence, namely,

his 2001 conviction in Arizona state court for discharging a firearm at a residential structure. At the sentencing hearing, the district court overruled Martinez-Martinez's objection to treating his prior conviction as a crime of violence, pointing to this court's decision in *United States v. Cortez-Arias*, 403 F.3d 1111 (9th Cir. 2005), where we found that California's statute barring the discharge of a firearm at an "inhabited dwelling house" was a crime of violence. The district court found that the Arizona statute in Martinez-Martinez's case was equivalent to the one under review in *Cortez-Arias* because the Arizona statute barred discharging a firearm at a "residential structure." The district court found the statute's reference to a residence as sufficient to fall within our decision in *Cortez-Arias*. Essentially, the district court equated the statutory use of the term residence with that of a person's present home. Significantly, the district court did not inquire into what the Arizona statute meant by "residential structure" and whether that definition went beyond the California statute we reviewed in *Cortez-Arias*. This appeal followed.

## II.    WHAT CONSTITUTES A CRIME OF VIOLENCE?

In determining whether a state criminal statute is a "crime of violence," we must follow the path set for us in *Taylor v. United States*, 495 U.S. 575 (1990) — we look to the statutory elements of the prior offense, not the underlying conduct giving rise to the offense itself or the statutory label affixed to the crime in question, and compare it to the generic definition of the offense. *See Huerta-Guevara v. Ashcroft*, 321 F.3d 883, 887 (9th Cir. 2003) (court "make[s] a categorical comparison of the elements of the statute of conviction to the generic definition [of a 'crime of violence'], and decide[s] whether the conduct proscribed [by the state statute] is broader than, and so does not categorically fall within, this generic definition" (citing *Chang v. INS*, 307 F.3d 1185, 1189 (9th Cir. 2002))). Such a categorical approach is an outgrowth of the fact that USSG section 2L1.2 refers to predicate offenses not in terms

of the defendant's prior conduct but to his prior "convictions" and the "elements" of that prior offense.

A limited exception exists to this categorical approach. *Taylor* recognized that state criminal statutes that define their offenses broadly enough to go beyond that covered by the generic definition may nonetheless be used to enhance a defendant's sentence when the defendant's prior conviction necessarily rested on those elements identifying the crime as a generic offense. 495 U.S. at 602. Significant for this case, in conducting this modified categorical approach in cases where the prior conviction was obtained through a guilty plea, the Supreme Court has limited the court's review to those documents "made or used in adjudicating guilt" such as "the terms of the charging document, the terms of a plea agreement or [the] transcript of [the] colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information." *Shepard v. United States*, 544 U.S. 13, 20, 26 (2005).

**[1]** At the outset some background is in order. The sentencing enhancement at issue in this case provides that the base offense level for a person convicted of violating section 1326 is eight. *See* USSG § 2L1.2(a). That base level, however, is increased by sixteen if the defendant was "previously . . . deported . . . after a conviction for a felony that is . . . a crime of violence . . . ." USSG § 2L1.2(b)(1)(A)(ii). The commentary to this section of the Sentencing Guidelines defines a "crime of violence" as including those offenses "under federal, state, or local law that [have] as an element the use, attempted use, or threatened use of physical force against the person of another." USSG § 2L1.2, cmt. n. 1(B)(iii) (2006). As we noted in *Cortez-Arias*, "[n]either this guideline nor its commentary in explicit words refer to [what] crimes involve 'conduct that presents a serious risk of physical injury to another.' " 403 F.3d at 1114. *Cortez-Arias* filled this gap in

the context of an offense involving the discharge of a firearm at structures.

The primary issue pressed by the parties in this case concerns the scope of the generic definition for a crime of violence with respect to state laws proscribing the discharge of firearms at buildings pursuant to *Cortez-Arias*. Posed another way, what was it about the California statute at issue in *Cortez-Arias* that convinced this court that a conviction for violating that statute amounted to a "crime of violence"? Only by understanding this point can we determine whether Arizona's comparable statute meets the generic definition and, if not, whether any judicially noticeable document demonstrates that Martinez-Martinez's 2001 prior conviction necessarily rested on those elements we identified in *Cortez-Arias* that render the crime a generic offense.

### III.   CALIFORNIA STATUTE AT ISSUE IN *CORTEZ-ARIAS*

The particular statute under review in *Cortez-Arias* was California Penal Code section 246. The statute provided, in relevant part, that "[a]ny person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house . . . is guilty of a felony," and further provided that " 'inhabited' means currently being used for dwelling purposes, whether occupied or not." CAL. PENAL CODE § 246. In determining whether a violation of section 246 was a "crime of violence" under USSG section 2L1.2, we first noted that, under California law, an "inhabited dwelling house" has invariably been described as meaning one's home. *Cortez-Arias*, 403 F.3d at 1115 (citing *People v. White*, 4 Cal.App.4th 1299, 1301-03 (1992) (labeling an "inhabited dwelling house" as one that is "lived in" or where "a person currently and permanently lives")). It was the present occupancy of the structure in question that drove California courts to remark that commission of the offense "*always* present[ed] a potential for violence" and involved "a high probability that death will

result and therefore is an inherently dangerous felony." *Id*. (quoting *White*, 4 Cal.App.4th at 1305 and *People v. Hansen*, 9 Cal.4th 300, 309 (1994)).

**[2]** With this understanding of the nature of the statutory offense at issue, we next gave meaning to the Guideline's reference to the "threatened use of physical force against the person of another" as including "acts that communicate to another person an intent to use physical force against that person and acts suggesting that physical force against that person may be impending." *Id*. at 1116. Taking this definition and applying it to the context of discharging a firearm at a structure, we noted that such an offense would qualify as a "crime of violence" where the structure in question was that person's current and permanent residence, even if the person was not inside the structure at the time the firearm was discharged at it. As we explained:

> A person whose home is shot up by an instrument of deadly force, even though that person may have been absent at the time of the shooting, will surely feel threatened by the physical force that has intruded on his or her home. We hold that maliciously and willfully shooting a gun at a person's current permanent residence necessarily threatens the use of physical force against the resident, regardless of whether the resident is home at the time the shot is fired.

*Id*. In essence, it is the psychological link a person makes between his or her home and his or her personhood that prompted us to find that an attack against one is a threat to the other.

## IV.   THE GOVERNMENT'S POSITION

The government posits that our decision in *Cortez-Arias* is far broader than the statements in that decision would suggest.

By pointing to a few California appellate court decisions, the government contends that California Penal Code section 246 has been "interpreted . . . as including dwellings in which the resident is temporarily absent." That a person may be *absent* from their home, however, is not what this court found to be determinative insofar as the generic offense was concerned. We allowed for such absence from the structure in question. *See* 403 F.3d at 1116 (noting shooting a firearm at a structure even if the owner was "absent at the time of the shooting" did not alter the analysis that the offense met the generic definition). The occupant's presence was not what was critical in making the shooting at the structure a crime of violence; rather, it was the fact that the structure in question was one's current and permanent *home* that was determinative.

Moreover, most of the cases cited by the government stand for the unremarkable proposition that a dwelling is considered inhabited even if the person is still in the midst of moving in or moving out of the residence, *see People v. Hughes*, 27 Cal.4th 287 (2002); *People v. Hernandez*, 9 Cal.App.4th 438 (1992), or where a tenant intends to move out but has yet to start actually moving out of the dwelling, *see People v. Jackson*, 6 Cal.App.4th 1185 (1992). Nothing in those cases contradicts our statement in *Cortez-Arias* that California Penal Code section 246 required the residence in question to be one's "home" in order for it to fall within that statute's provisions. *Id*. at 1116.

Even the one case that appears at first blush to be the most helpful in the government's cause, *People v. Marquez*, 143 Cal.App.3d 797 (1983), does not, in the end, change the calculus framed in *Cortez-Arias*. In *Marquez*, the California appellate court found that a house was still considered inhabited even though the resident had been absent from the home for over two-and-a-half years under a conservatorship. 143 Cal.App.3d at 802. Such a lengthy absence may well convey the impression that the home had been abandoned by the owner and thereby reinforce the government's contention

concerning the breadth of section 246. The court in *Marquez*, however, stressed that, if in fact the owner had abandoned the home, the defendant would not have been liable for first-degree burglary. *Id*. The court observed that whether a dwelling is considered inhabited turns on its "*present* use rather than past or future intended use . . . ." *Id*. at 801 (emphasis added). As that court explained:

> Just as we look to the intent of the intruder at the time of entry in determining whether the crime of burglary was committed, so must we look to the intent of the occupier or person entitled to occupy the dwelling to determine if it is inhabited within the meaning of Penal Code section 459. . . .

> There is no evidence in the record that Lindemann or her conservators acting on her behalf ever vacated or abandoned her residence to live in some other place. . . . It is the intent and not the length of absence which controls.

*Id*. at 801-802. Far from suggesting that a discharge of a firearm into an abandoned dwelling would fall within the statute's sweep, *Marquez* provides that only so long as someone has a present intention to keep a dwelling as their current and permanent home (even if they are temporarily absent from the same) will the burglary statute apply. It is this precise element that we found in *Cortez-Arias* was necessary for section 246 to fall within the generic definition of a state law that "has as an element the use, the attempted use, or threatened use of physical force against the person of another."

[3] Finally, even if the government is correct that California defines inhabited dwelling so as to include temporarily abandoned structures, this does not undermine our independent determination in *Cortez-Arias* as to what suffices to meet the generic definition of a "crime of violence" — that only by shooting at a person's "current and permanent residence" can

someone threaten the person of another because one's home is so intimately intertwined into their physical being and feelings of security and well-being. One can be mistaken as to the former without vitiating the legal soundness of the latter. It is that principle of law from *Cortez-Arias* that guides our decision as to whether Arizona Revised Statutes section 13-1211 falls within the generic definition for a "crime of violence."

## V.   ARIZONA STATUTE AT ISSUE HERE

**[4]** Arizona Revised Statutes section 13-1211 provides, in relevant part, that "[a] person who knowingly discharges a firearm at a residential structure is guilty of a class 2 felony. . . . For the purposes of this section: . . . '[r]esidential structure' means a movable or immovable or permanent or temporary structure that is adapted for both human residence or lodging [and] '[s]tructure' means any building, vehicle, railroad car or place with sides and a floor that is separately securable from any other structure attached to it and that is being used for lodging, business or transportation."

The parties have not cited to, nor have we been able to find, any Arizona state court opinion construing section 13-1211's terms. One Arizona state appellate court opinion did, in passing, describe section 13-1211 as "knowingly discharging a firearm at an occupied residence, a class 2 dangerous felony . . . ." *State v. Cutright*, 2 P.3d 657, 659 (Ariz Ct. App. 1999), *overruled on other grounds by*, *State v. Miranda*, 22 P.3d 506 (Ariz. 2001). Reference by that court to section 13-1211 as involving an "occupied" residence certainly could meet this court's generic definition of a "crime of violence." *See United States v. Lopez-Torres*, 443 F.3d 1182, 1185 (9th Cir. 2006)("Because the other places enumerated in section 246— motor vehicles, buildings, and air craft—must be occupied, shooting at one of these places also involves 'the use, attempted use, or threatened use of physical force against the person of another,' and qualify as a crime of violence under § 2L1.2"). To commit the offense the defendant would have

to discharge his firearm at a structure that was "occupied" by someone. The existence of a present occupant to the structure attacked by the defendant would have all the hallmarks we held in *Cortez-Arias* as making the offense one where there is a threat of force to the person of another — a structure that is closely associated by a person with their own physical integrity. That said, the state court decision did not so much construe section 13-1211 as it simply came up with a shorthand way of referring to it; *Cutright* did not explicate the statute's elements or seek to elucidate their meaning.

With no state court opinion construing the statute's elements, we must begin with the statute itself. Martinez-Martinez asserts that the statute's terms include structures ranging far beyond those traditionally conceived as a person's home, and include structures such as a person's temporary, as opposed to permanent, residence. Addressing each point in turn, we find that neither construction is worthy of credence. That the statute includes structures such as railroad cars or a lean-to made up of cardboard and other make-shift materials is not itself a fault for purposes of this case. Such structures are commonly used by the homeless as a shelter from the elements. That a structure may be dilapidated does not make it any less a person's home. Fault would only lie if the statute covered such structures without requiring that they be a person's present home.

Martinez-Martinez's repeated refrain that section 13-1211 covers "temporary residences" fares no better. His argument conflates two distinct concepts contained in section 13-1211: When section 13-1211 employs the word "temporary" it does so in relation to and to modify the term "structures," not the length or duration of the person's residence. By noting that "temporary" as well as other types of "structures" were covered under the statute's prohibitions, the state legislature sought to capture as many structures as possible that individuals might use as their home, from buildings traditionally asso-

ciated with a person's living quarters to such transitory structures as a tent or a lean-to.

**[5]** When speaking of the nature of the residence — the occupancy question that is central to the question presented in this case — the statute covers those structures "adapted for both human residence or lodging." That the structure is one that has been "adapted" for human residence could certainly connote that the structure is presently being used for such residence. The word adapt is written in the past tense, meaning that whatever made the structure a residence or lodging occurred before the offense in question took place. Indeed, the word adapted is defined as "fitted." Oxford English Dictionary (2nd ed. 1989). If something has been fitted as a residence one could reasonably envision it as currently serving as one as well. That being said, adapted can also simply denote that the structure is *capable* of being inhabited, not that it is, in fact, inhabited. The dictionary defines adapted as also meaning "fit" or "suitable." *Id*. If something is simply capable of being a residence, instead of actually serving as one, then the commission of the offense under Arizona law would not square with our holding in *Cortez-Arias*; it would be difficult to conceive of a sufficiently close connection existing between a person and a currently unoccupied, uninhabited structure (even if it is *capable* of being used as a residence at any time). Under the reasoning of *Cortez-Arias*, for there to be a threat to one's person, the structure attacked by a firearm must have an individual whose sense of self is closely connected to that structure; the only instance in which we have found such a close connection is when the structure is someone's *current* home.

Given the ambiguity of the statutory terms on the critical issue in this case, the government has pointed to parts of the statute's rather sparse legislative history to buttress its argument that section 13-1211 covers only presently inhabited residences. There are statements from individuals who testified in support of section 13-1211's passage that the meaning of

"residential structure" was "meant to be a home," and that the statute's purpose "was to cover those individuals who get out of a car to do a drive-by shooting." Hearing on H.B. 2001, H.B. 2056, H.B. 2002, and H.B. 2011 Before the H. Committee on the Judiciary, 42nd Leg., 3rd Spec. Sess. 2-3 (Jan. 17, 1996) (statements of William Perry, Chief Criminal Deputy of the Pinal County Attorney's Office, and Fred Griisser, a representative of the NRA).

The remark in the committee hearing on section 13-1211 that the statute was meant to protect a person's "home" is undermined by the speaker's further statement regarding the breadth of the statutory language in accomplishing that goal. The speaker expressed concern that, while "[t]he intent of 'structure' is meant to be a home . . . , as written, [it] could be construed to mean any structure." Hearing on H.B. 2002 Before the House Committee on the Judiciary, 42nd Leg., 3rd Spec. Sess. 3 (Jan. 17, 1996) (statement of Fred Griisser). Finding fault with "the broadness of the definition," the speaker urged state legislators to "amend [the] language to be more specific" to cover only the discharge of a firearm at one's home instead of "some individuals [who] practice target shooting at vehicles." *Id.* The state legislators rejected the suggestion, expressing "satisfaction with the [statute's] language . . . as written," and even opining that "any reasonable person can make a distinction between target practice and the actual shooting at an object, structure, etc.," making it unnecessary "to amend [the] language to make the distinction." *Id.* (statements of Chairman Smith and Mr. Mortensen). Although these statements during the drafting of section 13-1211 certainly would support the notion that the statute at least covers presently inhabited structures, nothing in those statements connotes that such a purpose was to the exclusion of also covering presently uninhabited, but capable of being inhabited, structures. The legislators were made aware that the statute's provisions as written were susceptible to being construed very broadly, but did nothing to attempt to cabin the statute's reach.

With the statute's terms open to debate and the legislative history not illuminating on the topic, the parties have directed our attention to use of the term "residential structure" in other statutory provisions, most notably Arizona's residential burglary statute. As both section 13-1211 and the Arizona burglary statute utilize the same terms and, indeed, define those terms nearly identically, the case law elucidating the meaning of those same terms as used in the burglary statute is applicable to understanding the scope of section 13-1211's terms.[1]

Martinez-Martinez argues that the state appellate court decision in *State v. Bass*, 911 P.2d 549 (Ariz. Ct. App. 1995), demonstrates that a residential structure includes a building that has "never yet served" as a residence. His argument is not supported by the facts or holding in that case. In *Bass*, the court was called upon to decide whether someone who burglarized "an almost-completed log cabin home" was guilty of second-degree burglary. In answering this question, whether the log cabin qualified as a residential structure was critical, as only breaking and entering into a residential structure qualifies as second-degree burglary. As recounted by the state court, "[a]t the time of the burglary, the cabin shell was up, the roof was installed, and the windows were in, but the plumbing and electrical systems were not operative, and the doors had not been installed. The cabin had passed 'rough-in final' inspection but had not received a certificate of occupancy." *Id.* at 550. Despite the nearing completion of the log cabin, the court held that "the State failed to present substantial evidence that the almost-completed cabin" was "adapted for both human residence and lodging." *Id.* at 552. *Bass* thus stands for the proposition that, unless and until a structure is

---

[1]Arizona's burglary statute classifies the entry into a "residential structure" with the intent to commit a felony therein as second-degree burglary, a class three felony. *See* Ariz. Rev. Stat. § 13-1507. The term "residential structure" in turn is defined as "any structure, movable or immovable, permanent or temporary, adapted for both human residence and lodging whether occupied or not." Ariz. Rev. Stat. § 13-1501(11).

one where a person can in fact live, it does not qualify as a residential structure.

The critical point for our purposes, however, is not whether a structure must be habitable for section 13-1211's provisions to apply, but whether section 13-1211 requires that someone be actually living at the structure when the offense takes place. Other state court decisions shed light on that particular question.

In *State v. Gardella*, 751 P.2d 1000, 1002 (Ariz. Ct. App. 1988), the court noted that "the word 'residence' as used in the [burglary] statute embraces two concepts: (1) the word is in contradiction to a general commercial use or a use unassociated with a home, . . . and (2) the word 'residence' includes everything connected with the residential structure to make it more suitable, comfortable or enjoyable for human occupancy." The *Gardella* court's reference to a "residential structure" as one that is associated with a person's "home" certainly would support the notion that the present existence of a human occupant of the structure is a necessary condition for the offense to occur. Later cases, however, stressed the latter half of *Gardella*'s formulation — its suitability for habitation (not its present occupancy) — in determining what is and what is not a residential structure. Thus, in *State v. Ekmanis*, 901 P.2d 1210, 1212-13 (Ariz. Ct. App. 1995), the court found that a storage room attached to a home was a "residential structure" because it made the house proper more comfortable or suitable for occupancy. In rendering this decision the court specifically referenced the second half of *Gardella*'s formulation. *Id*. This line of cases reached its fullest expression in *State v. Engram*, 831 P.2d 362 (Ariz. Ct. App. 1991).

There the defendant was convicted of committing a residential burglary when he broke into and attempted to steal gas wall heaters from an apartment building that was undergoing remodeling. At the time of the burglary, "one of the ten [apartment] units was rented" and the others were being

remodeled. *Id.* at 367. Even though a lease existed as to one of the apartment units, "there were no tenants living in the apartments" there. *Id.* Indeed, the last time someone had actually been living in the apartment complex was a month *prior* to the burglary. *Id.* The defendant argued that his conviction was improper "because there was evidence . . . that the apartments were not fit for human habitation." *Id.* The state appellate court disagreed, noting that "all that is necessary to support a charge of residential burglary" is that the structure in question was "intended for residential *use*," not that it was in fact being used as a residence at the time. *Id.* (emphasis added). So long as there was evidence indicating that "the apartments were . . . *suitable* for residential use," that was enough to let the issue go to the jury to resolve whether the defendant had committed second-degree burglary. *Id.* (emphasis added).

**[6]** In other words, for purposes of the crime of second-degree burglary, a residential structure includes even one that was presently vacant and uninhabited or not in use pending occupation by a different occupant at the time the burglary was committed. The state court's focus on a structure's *suitability* for residency, as opposed to whether the structure was in fact *occupied*, places the Arizona statute much further afield from the conduct sought to be captured by our holding in *Cortez-Arias*. If a residential structure need not even be someone's home (in the sense that the structure had a present occupant) for the offense to have been committed, it is hard to conceive how shooting a firearm at such a vacant building would threaten the person of another, there being no one with a close connection or identity to the structure in question such that an attack against it would be felt as an immediate and palpable threat against that person. Without some occupant (even an absent one) to feel threatened by the attack against the building, violating section 13-1211 simply cannot categorically serve as a "crime of violence." As that is how the Arizona statute under review applies, Martinez-Martinez's prior

conviction for discharging a firearm at a residential structure is not categorically a conviction for a crime of violence.

## VI.   APPLICATION OF THE MODIFIED APPROACH

**[7]** If the statute criminalizes conduct that goes beyond that which would constitute a "crime of violence" under the generic definition, then we consider whether documentation or other judicially noticeable facts in the record indicate that Martinez-Martinez was convicted of the elements of the generically defined crime. *See Shepard*, 544 U.S. at 20-21. The only documentation before the district court in this case was the plea agreement entered into by Martinez-Martinez in the 2001 proceedings, the indictment, and the judgment of conviction. Those documents simply show that Martinez-Martinez was charged, later pled guilty to, and was eventually sentenced for "knowingly discharg[ing] a firearm at a residential structure at 5977 Heather Drive, Willcox, Arizona," in violation of section "13-1211" that was "[s]pecifically designated [as] a non-dangerous crime for the purpose of this plea agreement."

**[8]** Recitation of the statutory elements themselves is insufficient to demonstrate that a defendant's prior conviction necessarily included the generic offense where the state statute in question has been found to be overly broad in relation to the generic definition for a "crime of violence." *See United States v. Lopez-Montanez*, 421 F.3d 926, 931 (9th Cir. 2005) (holding that documents submitted are insufficient when they "simply restate[ ] the language of the statute" and "merely state that [the defendant] pled no contest to" the charged statute). Instead, under this modified categorical approach, judicially noticeable documents must "unequivocally establish[ ] that the defendant was convicted of the generically defined crime, even if the statute defining the crime is overly inclusive." *Id.* (quoting *United States v. Corona-Sanchez*, 291 F.3d 1201, 1211 (9th Cir. 2002)(en banc)(quotations omitted)). Similarly, the fact that a street address is given for where Martinez-

Martinez committed his crime in no way by itself unequivocally establishes that the structure in question was currently inhabited by someone (as opposed to being one that was capable of housing someone). Such an address simply indicates that the structure in question was located near or on a street.

Looking at the description of the other offense Martinez-Martinez was charged with in conjunction with section 13-1211 is similarly unavailing. Martinez-Martinez also pled guilty to "caus[ing] a substantial risk of imminent death to Graciela Garcia" in violation of Arizona Revised Statutes section 13-1201 on the same day he discharged a firearm. Although it is certainly reasonable to assume that the two crimes were related (and perhaps took place at the same time given that they occurred on the same day), nothing in the plea agreement itself ties the two together in such a manner. Martinez-Martinez could have committed the crimes at two different places on the same day, just as he could have committed them at the same place at the same time on the same day. If the plea agreement had noted the same address with respect to the discharge of the firearm crime in conjunction with the one for endangerment, then at least factual inferences would have started taking shape from which we could begin to accept such a factual proffer. The plea agreement, however, does not make such a connection.

**[9]** Although the pre-sentence report's recitation of the facts underlying Martinez-Martinez's 2001 conviction clearly provides the nexus between the discharge of the firearm and the occupancy of the residence, the report is an improper source to consult. First, the exclusive source for the information was the police reports generated at the time of Martinez-Martinez's arrest back in 2001. The Supreme Court has rejected the naked consultation of police reports in performing a modified categorical approach. *See Shepard*, 544 U.S. at 21-23; *cf. United States v. Espinoza-Cano*, 456 F.3d 1126 (9th Cir. 2006) (allowing consideration of police report as part of modified categorical approach but only because the report

was incorporated by reference into the criminal complaint underlying the prior conviction). Moreover, we have held that "a description of the facts underlying the conviction in a pre-sentence report" is " 'insufficient evidence to establish that the defendant pled guilty to the elements of the generic definition of a crime when the statute of conviction is broader than the generic definition.' " *Huerta-Guevara*, 321 F.3d at 888 (quoting *Corona-Sanchez*, 291 F.3d at 1212).

**[10]** Given that section 13-1211's statutory elements include conduct ranging beyond that we have found to categorically demonstrate that the discharge of a firearm at a structure qualifies as a crime of violence, and because the judicially noticeable documents tendered by the government to the district court are insufficient to show unequivocally that Martinez-Martinez was convicted of the generically defined offense, the district court erred in enhancing Martinez-Martinez's sentence by sixteen-levels pursuant to USSG section 2L1.2(b)(1)(A)(ii). As a result, we need not reach Martinez-Martinez's remaining arguments.

## VII.   CONCLUSION

Accordingly, the district court's sixteen-level enhancement of Martinez-Martinez's sentence under USSG section 2L1.2(b)(1) is reversed and the matter is remanded for re-sentencing in conformity with this opinion.

**REVERSED AND REMANDED.**