[No. C057232. Third Dist. June 15, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
DWAYNE MEREDITH, Defendant and Appellant.

COUNSEL

James F. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Larenda Delaini, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**HULL, J.**—A jury convicted defendant Dwayne Meredith of first degree burglary (count 1; Pen. Code, § 459), receiving stolen property (count 2; Pen. Code, § 496, subd. (a)), and possession of methamphetamine (count 3; Health & Saf. Code, § 11377, subd. (a)). In a bifurcated proceeding, defendant admitted two prior prison terms (Pen. Code, § 667.5, subd. (b)) and one prior strike (Pen. Code, §§ 667, subds. (b)–(i), 1170.12) which also qualified as a five-year enhancement (Pen. Code, § 667, subd. (a)). The trial court sentenced defendant to an aggregate state prison term of 15 years (the four-year midterm on count 1, doubled for the prior strike, two consecutive one-year terms for the prior prison terms, and a five-year consecutive enhancement under Pen. Code, § 667, subd. (a)).

Defendant contends (1) compelling him to appear in jail clothing throughout the trial violated due process; furthermore, it prejudiced him as to count 1 because insufficient evidence supported his conviction for burglary; and (2) the trial court erred prejudicially by refusing defendant's request to modify CALCRIM No. 1701 (Judicial Council of Cal. Crim. Jury Instns. (2007–2008) CALCRIM No. 1701). We affirm the judgment.

FACTS AND PROCEEDINGS

By the year 2006, Melvin Olsen, aged 93, had lived in a house on T Street in Sacramento for 70 years. He owned and occupied it alone.

In September of that year (all of the events we set forth in this opinion occurred in 2006 unless otherwise stated), Olsen entered a hospital, suffering from dementia and age-related physical problems. In October, he was transferred to a skilled nursing facility.

Before going into the hospital, Olsen asked Wayne W., his accountant and longtime friend, to take care of the house. Olsen did not ask or authorize Wayne W. to sell the house or to remove any personal belongings. According to his son, Olsen was "adamant that all of his things stayed just the way they are" because "he was planning on coming back." To Wayne W.'s knowledge, Olsen kept stock documents, cashier's checks, traveler's checks, and as much as $13,000 in cash in the house.

In keeping with Olsen's wishes, Wayne W. paid the utility bills and property taxes, hired a landscaper to maintain the yard, checked on the house periodically, picked up the mail, took trash cans out to the street, and went in occasionally to spray the air. Whenever he left the house, he locked the doors and secured the windows.

While it is somewhat unclear from the record, on December 26, Olsen may have been taken off life support.

On the morning of December 27, Wayne W. drove to Olsen's house for the first time in a week; he had probably not been inside for two weeks. He pulled into the driveway, checked the mail, and walked back to his truck. At that point he saw two strangers, a Black man and a White man, coming out of the garage. (He identified defendant in court as the Black man.) When he asked them their names, they walked away in opposite directions; the White man crossed the front yard and walked down the street, while the Black man went around the back. Wayne W. followed the White man, who turned around, got into a nearby parked car (the license plate number of which Wayne W. recorded), and sped off.

Wayne W. called 911, but because the police did not arrive quickly, he drove off looking for the Black suspect. He spotted the man jumping a fence while talking on a cell phone, then lost sight of him. Encountering a University of California, Davis, police officer, Wayne W. told him the story. Ultimately, the UC Davis police detained a car and two suspects, including defendant, whom Wayne W. identified.

Accompanying law enforcement into Olsen's house, Wayne W. found the bolts pulled out of the garage door and property strewn all over the inside of the house. When Olsen's son went in, he saw that all the drawers had been dumped out and the locked closets had been broken into. He made a list of

missing valuables, including a mink stole, a man's Seiko watch, a string of pearls, silver bars, coins, $15,000 in cash, and firearms.

A criminalist checked the scene for latent prints, but found none. Neighbors reported that they had not seen or heard anything unusual on the morning of the crime.

When defendant was searched after his detention, he was found not to have any items on him from the list of Olsen's son. In addition to methamphetamine, however, the officers found a $100 traveler's check bearing Melvin Olsen's signature in defendant's wallet. According to Wayne W., Olsen had acquired traveler's checks for a trip, but kept the unused ones at home. Olsen's son testified that his father would never have thrown them away. The authorities also found a pen in defendant's jacket labeled "Mel Dor Enterprises," a name which combined the first syllables of Olsen's and his late wife's first names; he had kept pens such as those in the house.

On December 31, suffering from pneumonia and having taken an "[u]nexpected turn for the worse," Olsen died without ever having returned home.

Defendant did not put on evidence.

In argument, trial counsel conceded defendant's guilt on count 2 (receiving stolen property) and count 3 (possessing methamphetamine) but disputed count 1 (first degree burglary) on factual and legal grounds. Counsel asserted that the evidence on this count was insufficient: defendant did not possess any stolen property other than that going to count 2; his fingerprints were not found at the scene; and, noting that the neighbors did not notice anything unusual on December 27, argued that others must have invaded the house before that date because so much property was missing. Counsel also asserted that even if defendant entered the house that day and took property, he could not legally have committed first degree burglary because by that time the house was no longer an inhabited dwelling.

DISCUSSION

I

*Defendant's Clothing During Trial*

Defendant contends that he suffered prejudice when the trial court forced him to wear jail clothing throughout trial. The People concede error, but argue that it is harmless beyond a reasonable doubt. We agree.

Defendant moved in limine to be allowed to wear civilian clothing at trial. The trial court granted the motion but, as jury voir dire was about to begin defense counsel told the trial court that, due to his size (defendant at the time was six feet four inches tall and weighed 268 pounds), defendant had not yet been able to procure nonjail clothing. Counsel objected to beginning the trial with defendant dressed in jail clothing, but the court did not want to delay voir dire, and the trial judge decided to proceed with defendant dressed as he was.

At the beginning of trial, the trial court instructed the jury panel not to form a bias against defendant because he was in custody or to speculate as to why; the court explained that the most common reason for being in custody is inability to make bail. The court gave this instruction again during the voir dire. The court did not mention defendant's clothing.

Defense counsel said to the prospective jurors: "You all have been told my client is wearing the bright orange of the Sacramento County jail uniform," then asked: "So nobody is going to give weight to the fact that he's . . . wearing orange . . . , fair to say?" No one indicated that he or she would do so.

During trial, Wayne W. was asked if he saw either person who had come out of the garage on December 27. When he said he did, the prosecutor asked: "Can you point to that person and tell us what he's wearing?" Wayne W. answered: "Orange shirt, sitting across from me."

The prosecutor later asked one of the investigating officers whether he had had any contact on December 27 with "the man in the orange jumpsuit at the end of counsel table" and whether he recognized "the man in orange today" as one of the persons he had seen on that date; he answered that he did. The prosecutor asked another investigating officer if he recognized "the man in orange here at counsel table"; the officer did. Finally, the prosecutor asked Olsen's son, "Do you know the man in orange at the end of counsel table?"

 To compel a defendant to go to trial wearing jail clothing violates his constitutional rights to a fair trial, due process, and equal protection. It creates an unacceptable risk of undermining the presumption of innocence in the jury's eyes. Furthermore, it does not serve any essential state interest, and it is imposed discriminatorily on those who cannot afford to make bail. (*Estelle v. Williams* (1976) 425 U.S. 501, 503–505 [48 L.Ed.2d 126, 130–131, 96 S.Ct. 1691] (*Estelle*); *People v. Taylor* (1982) 31 Cal.3d 488, 494–495 [183 Cal.Rptr. 64, 645 P.2d 115] (*Taylor*).) Nevertheless, the error is not reversible per se, but may be found harmless beyond a reasonable doubt under the *Chapman* standard (*Chapman v. California* (1967) 386 U.S. 18, 21–22

[17 L.Ed.2d 705, 709, 87 S.Ct. 824]). (*Estelle, supra,* 425 U.S. at pp. 507–508 [48 L.Ed.2d at pp. 132–133]; *Taylor, supra,* 31 Cal.3d at pp. 499–500; *People v. Pena* (1992) 7 Cal.App.4th 1294, 1305–1306 [9 Cal.Rptr.2d 550].)

We note that this claim of error may be forfeited by defendant's failure to timely object or otherwise bring the matter to the trial court's attention. (*Estelle, supra,* 425 U.S. at pp. 512–513 [48 L.Ed.2d at p. 135]; *Taylor, supra,* 31 Cal.3d at p. 495.) The Attorney General concedes, however, that defendant raised the issue sufficiently below, even though he did not object to the court's ruling, the prosecutor's questions, or the witnesses' remarks.

In any event, in *Taylor*, on which defendant relies, the Supreme Court found the error was not harmless beyond a reasonable doubt because (1) witnesses' descriptions of the defendant's clothing ("blue county clothes," "blue jail suit") pointed out that it was jail clothing; (2) evidence on key issues was hotly disputed; and (3) the defendant testified, putting his credibility in issue. Thus, the high court could not feel sure that the jury would have rejected the defendant's story if not for the prejudice aroused by seeing him in jail clothing. (*Taylor, supra,* 31 Cal.3d at pp. 499–501; see also *People v. Hetrick* (1981) 125 Cal.App.3d 849, 855 [178 Cal.Rptr. 303] [testifying defendant].) The present case is distinguishable.

Defendant's credibility was not in issue here because he did not testify or give an out-of-court statement. There were no significant evidentiary disputes: count 1 (the only contested count) turned on the legal meaning of the undisputed evidence that defendant illicitly entered Olsen's premises on December 27, fled rather than identify himself, and was found to be in possession of Olsen's property. Finally, insofar as the prosecutor's lone reference to defendant's "orange jumpsuit" could have been prejudicial, defense counsel's statement during voir dire that this was "the Sacramento County jail uniform" and, pursuant to his questioning, the jurors' assurances that they would not be biased against defendant because he was in jail, helped ensure that his jail clothing would not be held against him and severely lessened any prejudice defendant might otherwise have suffered. Unlike the fact situation in *Taylor*, the prosecutor's and witnesses' other references to defendant's clothing here mentioned only its color and not its provenance. Thus, *Taylor* is not persuasive authority for reversal here. Based on the factors delineated in *Taylor*, we conclude that the trial court's error in causing defendant to go through trial in jail clothing was harmless beyond a reasonable doubt.

Defendant asserts that there was insufficient evidence to show that he committed either burglary per se or first degree burglary and that, therefore, the jury's contrary verdict on count 1 could have resulted only from the bias attributable to his jail clothing.

Defendant's claim as to burglary per se lacks merit. He repeats his trial theory that other people must have burglarized the house on other dates because he did not possess any of the valuables on the property list of Olsen's son, and the items he possessed proved only that he received stolen property as charged in count 2.

██ However, on appeal we view the evidence most favorably to the verdict. (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) So viewed, the evidence established that defendant entered Olsen's premises illicitly and thereafter possessed items of his property which were normally kept in his residence. This sufficiently proved by reasonable inference that defendant entered "with intent to commit grand or petit larceny." (Pen. Code, § 459.) Whether others did the same on other occasions is immaterial. It is also immaterial that he did not acquire anything of great value, because he could properly have been convicted of burglary even if he had not acquired anything at all: unlike the offense of receiving stolen property, the offense of burglary does not have as one of its elements the obtaining of another person's property.

Defendant's claim of insufficient evidence as to first degree burglary depends on his contention that the trial court misinstructed the jury on the definition of that offense. Therefore, we address these contentions together in part II, *post*, of the Discussion. We there conclude that the trial court did not misinstruct the jury and that the evidence was sufficient to prove first degree burglary.

## II

### *The Request to Modify CALCRIM No. 1701*

Defendant contends that the trial court's refusal of his request to modify CALCRIM No. 1701, defining the degrees of burglary, denied him due process and requires reversal. We disagree.

The trial court proposed to instruct the jury with CALCRIM No. 1701 as follows: "Burglary is divided into two degrees. If you conclude that the defendant committed a burglary, you must then decide the degree.

"First degree burglary is the entry of an inhabited house or a room within an inhabited house.

"A house is *inhabited* if someone uses it as a dwelling, whether or not someone is inside at the time of the alleged entry.

"A house is *not inhabited* if the former residents have moved out and do not intend to return, even if some personal property remains inside.

"A house includes any garage that is attached to the house and functionally connected with it.

"All other burglaries are second degree.

"The People have the burden of proving beyond a reasonable doubt that the burglary was first degree rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree burglary."

Defense counsel filed a written motion to modify the instruction by inserting the word "currently" into the third paragraph, which would then read: "A house is inhabited if someone *currently* uses it as a dwelling, whether or not someone is inside at the time of the alleged entry." (Italics added.) In support, counsel cited only to Penal Code section 459, which provides in part: "As used in this chapter, 'inhabited' means *currently* being used for dwelling purposes, whether occupied or not. A house . . . is currently being used for dwelling purposes if, at the time of the burglary, it was not occupied solely because a natural or other disaster caused the occupants to leave the premises." (Italics added.)

At the instructions conference, defense counsel argued that the proposed modification was needed to clarify the defense's main theory, that "this house, on December 27th, was not an inhabited residence in terms of [the] statute" because it was not in "current use" as a residence. Stating that the unmodified instruction covered the defense's concerns and permitted the defense to argue its theory, the court denied the motion.

The trial court instructed the jury with unmodified CALCRIM No. 1701 as quoted above.

Penal Code section 460, subdivision (a) provides: "Every burglary of an inhabited dwelling house . . . is burglary of the first degree." Penal Code section 459 provides: " '[I]nhabited' means currently being used for dwelling purposes, whether occupied or not."

"California's burglary law 'stems from the common law policy of providing heightened protection to the residence. [Citations.]' (*People v. Cruz* [(1996)] 13 Cal.4th [764,] 775 [55 Cal.Rptr.2d 117, 919 P.2d 731].)" (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 317 [51 Cal.Rptr.3d 678].)

 "In keeping with the purpose of the statute, the term ' "inhabited dwelling house" ' has been given a 'broad, inclusive definition.' (*People v. Cruz, supra*, 13 Cal.4th at pp. 775, 779.) . . . [T]he ' " ' "inhabited-uninhabited" dichotomy turns . . . on the character of the use of the building.' " [Citation.] . . . "[T]he proper question is whether the nature of the structure's composition is such that a reasonable person would expect some protection from unauthorized intrusion." [Citation.]' (*People v. DeRouen* [(1995)] 38 Cal.App.4th [86,] 91–92 [44 Cal.Rptr.2d 842] [disapproved on other grounds in *People v. Allen* (1999) 21 Cal.4th 846, 865–866 [89 Cal.Rptr.2d 279, 984 P.2d 486]], italics omitted.)" (*People v. Villalobos, supra*, 145 Cal.App.4th at pp. 317–318.)

 "For purposes of the California first degree burglary statute, a structure 'need not be occupied *at the time*; it is inhabited if someone lives there, *even though the person is temporarily absent.*' (2 Witkin & Epstein, Cal. Criminal Law [(3d ed. 2000)] Crimes Against Property, § 114, p. 144; see *People v. Hughes* (2002) 27 Cal.4th 287, 354–355 [116 Cal.Rptr.2d 401, 39 P.3d 432] [apartment was inhabited even though occupant was in process of moving; her furnishings remained there, and she was present in apartment during daytime hours]; *People v. Hernandez* (1992) 9 Cal.App.4th 438 [11 Cal.Rptr.2d 739] [apartment was inhabited when tenants moved all of their belongings into it, but had not yet slept in it or unpacked]; *People v. Jackson* (1992) 6 Cal.App.4th 1185 [8 Cal.Rptr.2d 239] [dwelling continued to be inhabited because tenant who intended to move out had not vacated premises and was still using the house at time of robbery]; *People v. Marquez* (1983) 143 Cal.App.3d 797, 800, 802 [192 Cal.Rptr. 193] [house inhabited even though resident, under conservatorship, had been absent for two and a half years, because resident intended to return]; CALJIC No. 14.52 ['[an inhabited dwelling house] is inhabited although the occupants are temporarily absent'].) A structure that was once used for dwelling purposes is no longer inhabited when its occupants permanently cease using it as living quarters, and no other person is using it as living quarters. (*People v. Cardona* (1983) 142 Cal.App.3d 481, 483 [191 Cal.Rptr. 109] [house no longer inhabited when residents had moved and no identifiable person was currently using it as sleeping quarters]; *People v. Valdez* (1962) 203 Cal.App.2d 559 [21 Cal.Rptr. 764] [house not inhabited when previous tenant had moved out a week earlier and new tenant had not moved any belongings into house].)" (*People v. Rodriguez* (2004) 122 Cal.App.4th 121, 132 [18 Cal.Rptr.3d 550], italics added.)

 CALCRIM No. 1701, as given by the trial court, correctly told the jury: (1) For purposes of first degree burglary, if someone uses a house as a dwelling it is inhabited, even if no one is inside when the defendant enters; (2) But it is not inhabited if the person or persons who have used it as a dwelling have moved out without intending to return, even if their property

remains inside. (*People v. Rodriguez, supra*, 122 Cal.App.4th at p. 132; *People v. Marquez, supra*, 143 Cal.App.3d at pp. 800, 802; *People v. Cardona, supra*, 142 Cal.App.3d at p. 483.)

Defendant's proposed modification—which would have made the instruction read in relevant part, "A house is inhabited if someone *currently* uses it as a dwelling, whether or not someone is inside at the time of the alleged entry"—would not have clarified the instruction, because the added word "currently" in this sentence is at best redundant. As a matter of common sense and ordinary usage, one cannot simultaneously *use* and *not use* a house as a dwelling. Thus, CALCRIM No. 1701's expression "if someone uses it as a dwelling" already conveys the idea of current use. Contrary to defendant's claim, therefore, the unmodified instruction did not prevent the jury from grasping his theory of defense.

It is true, as defendant points out, that the former CALJIC instruction on this issue, tracking the language of Penal Code section 459, stated: "An inhabited [dwelling house] . . . is a structure which is *currently* used as a dwelling whether occupied or not." (CALJIC No. 14.52, italics added.) For the reasons already given, however, we think CALCRIM No. 1701 conveys the same meaning, simply translating it from the passive voice ("which is currently used") to the active voice ("if someone uses it").

However, as we explain *post*, because CALCRIM No. 1701's wording puts more focus on the activity of the dwelling's user, the insertion of "currently" into CALCRIM No. 1701 could create a misunderstanding which would not have arisen from the former instruction.

Not only is "currently" redundant in this context, it could be misleading. Because the expression "if someone currently uses it" puts undue stress on the use made of the dwelling by the owner or tenant at that moment in time, a jury so instructed might conclude that a dwelling is not "inhabited" unless its owner or tenant is in residence (even if not on the premises) at the time of the defendant's entry. *People v. Marquez, supra*, 143 Cal.App.3d 797 teaches that such a conclusion would be contrary to law.

As mentioned above, in *Marquez* the owner of the burgled house had not lived in it for two and a half years; being under a conservatorship, she had moved to a boarding home. No one else was living in the house. However, a friend of the owner took care of the house, and someone came in every day. (*People v. Marquez, supra*, 143 Cal.App.3d at pp. 799–800.) The *Marquez* court held that the house was inhabited within the meaning of Penal Code section 459—which defined the term, then as now, to mean " '*currently* being used for dwelling purposes, whether occupied or not' "—even though the

owner had been away for a long time and "there [was] a doubt she [would] return" (143 Cal.App.3d at p. 801, italics added): "There is no evidence in the record that [the victim] or her conservators acting on her behalf ever vacated or abandoned her residence to live in some other place. The trial court concluded 'that [the victim] has not vacated or abandoned her residence but fully intends to return' and that the dwelling at the time of the burglary was inhabited even though temporarily unoccupied. It is the intent and not the length of absence which controls. For the reasons stated, we agree with the trial court's conclusion." (*Marquez*, at p. 802.)

If the victim in *Marquez* was using a residence as her dwelling in which she had not lived for two and a half years and to which she might never return, but which was being maintained in her absence, a fortiori Olsen, who had been absent from his residence for only three months, had never expressed the intent to abandon it or to relocate permanently, and had given express directions to maintain it, was using the residence as a dwelling.

Because defendant's proposed modification of CALCRIM No. 1701 was at best unnecessary and at worst misleading, the trial court correctly refused it.

Relying on *Marquez*, defendant asserts (1) there was no evidence that Olsen intended to return to his residence; (2) once he had been taken off life support the day before the crime he could not possibly have done so; and (3) therefore, there was insufficient evidence that Olsen's dwelling was inhabited for purposes of first degree burglary. We disagree.

Defendant's assertion that there was no evidence Olsen intended to return to his residence is incorrect. As we have already mentioned, Olsen's son testified that his father was "adamant that all of his things stayed just the way they are" because "he was planning on coming back." And in addition to these direct statements, the testimony of Wayne W. pointed to the same conclusion. Wayne W. testified that Olsen asked him to maintain the premises as is and did not direct him or authorize him to change anything. The only logical inference to draw from this testimony is that Olsen intended to return.

As for the life-support testimony, we have noted already that the evidence on this point was inconclusive. But even if it were clearly proven that Olsen had been taken off life support the day before the crime and would, in all likelihood, not be able to return to his home, this would not show as a matter of law, that Olsen's home immediately lost its character as a residence in light of the cases and principles we have cited and discussed earlier.

 Because there was substantial evidence that Olsen intended to return to his residence and no evidence that he had moved out or abandoned the

intent to return as of December 27, substantial evidence supported the jury's verdict that defendant committed first degree burglary on that date.

## DISPOSITION

The judgment is affirmed.

Nicholson, Acting P. J., and Robie, J., concurred.

A petition for a rehearing was denied July 2, 2009, and appellant's petition for review by the Supreme Court was denied September 30, 2009, S175000.