Filed 10/15/13

CERTIFIED FOR PARTIAL PUBLICATION<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C070257 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF113631) |
| v. | |
| PENNY LYNN BURKETT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Yolo County, David Rosenberg, J. Reversed in part and affirmed in part; remanded for resentencing.

Julia Freis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Stephen G. Herndon and Darren K. Indermill, deputy attorneys general, for Plaintiff and Respondent.

A jury convicted defendant Penny Lynn Burkett of first degree burglary (Pen. Code, § 459—count 1)[1] and vandalism (§ 594, subd. (b)(1)—count 2). Another count

---

<sup>*</sup> Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part II.

1

charging defendant with possession of burglary tools, a misdemeanor (§ 466—count 3), was dismissed prior to trial. The court imposed the midterm of four years for burglary, stayed sentence on a two-year midterm for vandalism, suspended execution of sentence, and granted probation.

Defendant appeals, contending the jury's special finding that the burglarized dwelling was inhabited is not supported by sufficient evidence. We agree and will reduce the offense to second degree burglary. We will vacate the sentence and remand for resentencing.

Our conclusion regarding the insufficiency of the evidence that the residence was inhabited renders moot defendant's additional contention that the trial court erred in denying her motion for acquittal challenging the degree of the offense.

Defendant finally claims the prosecutor committed prejudicial misconduct in his opening statement and closing arguments. As to defendant's claim that the prosecutor misstated the law and facts related to whether the dwelling was inhabited, our disposition of defendant's claim regarding the evidence on habitation renders the claim moot. We reject defendant's additional claim that the prosecutor committed misconduct in arguing facts not in evidence, facts linking defendant to the crime. The argument was not improper.

## FACTS

From 2008 to April 2011 Barbara Mattos rented a home located on Michigan Avenue in West Sacramento. Her landlord was Mersa Noor. In March or April 2011 Noor gave Mattos a one-month notice to vacate with the idea she would be out of the home by May 3 or 4. Noor lived with his family on Carmel Bay Road in West Sacramento but was losing his home to foreclosure and needed to move into the

---

[1] Undesignated section references are to the Penal Code.

2

Michigan Avenue home. He did not have an exact date by which he had to move out of his Carmel Bay Road home.

Mattos removed all her belongings from the Michigan Avenue home before April 30, 2011. Beginning April 28 and finishing late April 30, Mattos painted and cleaned the home with the help of several people. Mattos last viewed the inside of the home when she removed a vacuum or shampooer on May 1. There was nothing left inside the home. Mattos turned off all the utilities effective May 1. She had all the keys to the residence and attempted to contact Noor to return the keys to him, but she had been unsuccessful. Mattos called Noor about the burglary and returned the keys after that.

Noor testified that he did not have any keys to the Michigan Avenue residence. Noor never testified that he turned the utilities back on. He planned to move his family into the Michigan Avenue residence sometime after May 4. He had not moved anything into the home. Although he stayed a few nights after the May 2 burglary and used just a blanket, he did not move into the Michigan Avenue home until May 8 or 9.

About 2:00 p.m. on May 2, 2011, Jason Davis and Regena Langhorst, relatives of Mattos, drove by the Michigan Avenue residence on the way to Mattos's new home, located nearby. As they passed the residence, they observed defendant and Nicholas Cummings emerge from the backyard through a gate and walk along the driveway toward the street. Davis stopped the car, and they got out and confronted the pair. Cummings, who had a backpack, introduced himself as "Mike." Defendant and Cummings stated that they were there to see "Jamie."

Davis and Langhorst knew Jamie Pokrywka dated Mattos's nephew George Hansborrow. Pokrywka and Hansborrow had often stayed with Mattos when she lived in the Michigan Avenue residence. Pokrywka had helped clean and paint. Langhorst was aware of a serious fight between Pokrywka and Hansborrow and that Pokrywka had been arrested.

3

Langhorst told defendant and Cummings that "Jamie" was probably with "George," but the pair did not know "George" and stated that they were going to look for "Jamie" at her brother's place on Pecan Street. Davis knew that Pokrywka had a brother but he did not live on Pecan Street. Cummings claimed "Jamie" had another brother. Davis and Langhorst drove away only to be flagged down by defendant and Cummings, who wanted a ride. Davis and Langhorst refused.

About 10 to 30 minutes later, Davis and Langhorst returned to the Michigan Avenue residence and discovered that it had been broken into through a kicked-in door. Finding an assortment of tools on the floor and pipes and other things amiss, they called the police. A furnace had been pulled out and sheetrock had been pulled off the garage wall. Shower handles, pipes under the bathroom sink, and a towel rack were missing. The total damage was greater than $400.

The police located defendant and Cummings within an hour and not far from the Michigan Avenue residence. Cummings had wrenches, gloves, and other tools in his backpack. He also had a small envelope with snippets of copper-colored wire. Cummings first said he and defendant rang the doorbell looking for defendant's friend "Jamie." Cummings gave the officers other stories but finally admitted entering the residence; he claimed he did not plan to steal anything. Cummings' fingerprints were found on a pipe inside the home. Defendant's fingerprints were found on the inside of the furnace closet door. Defendant often went to a recycling center with scrap metal and did so about 10:00 a.m. on May 2.

## DISCUSSION

### I

The California Penal Code demarcates two degrees of burglary. Section 459 sets forth an extensive list of buildings, vehicles, containers, and other enclosures, including "any house," and provides that any person who enters them with intent to commit grand

or petit larceny or any felony is guilty of burglary. Section 460 provides that burglary of an "inhabited dwelling house" constitutes first degree burglary.

Defendant does not challenge the sufficiency of the evidence to support her conviction for burglary, for indeed she "enter[ed]" a "house" "with intent to commit grand or petit larceny" as prohibited in section 459. There is no dispute that the house was a "dwelling" house. Defendant denies, however, there is substantial evidence to support the jury's finding that the dwelling house was "inhabited," an essential element of burglary of the first degree as set forth in section 460.

The argument seems plausible at first blush, given the language of section 459 that " 'inhabited' means *currently being used* for dwelling purposes, whether occupied or not." (Italics added.) The previous tenant had departed, leaving no items of property behind, and while the owner had plans to occupy the premises, which were vacant and without utilities, he had taken no tangible steps to do so and did not even have keys to the house because the previous tenant had yet to return them. However, in the law of burglary what seems plausible often is not, and so we will not accept the argument without closer examination, no matter its superficial appeal and even though defendant insists it is supported by published authority directly on point. (*People v. Valdez* (1962) 203 Cal.App.2d 559 (*Valdez*).)

At common law a burglar was a person "that in the night breaketh and entreth into a mansion house of another, of intent to kill some reasonable creature, or to commit some other felony within the same, whether his felonious intent be executed or not." (3 Coke, Institutes of the Laws of England (1797 ed.) p. 63.) The home was hallowed at common law, so much so that burglary was punished by death. (*Id.* at p. 65.)

As the drafters of the Model Penal Code observe: "The notable severity of burglary penalties is accounted for by the fact that the offense was originally confined to violent nighttime assault on a dwelling. The dwelling was and remains each man's castle, the final refuge from which he need not flee even if the alternative is to take the

life of an assailant.  It is the place of security for his family, as well as his most cherished possessions.  Thus it is perhaps understandable that the offense should have been a capital felony at common law . . . ."  (Model Pen. Code & Commentaries, com. to § 221.1, p. 67.)

Protection of habitation remained a guiding value as the common law became enshrined in state burglary statutes.  However, the various state statutory formulations have not been uniform.  Many statutes make the dwelling the object of protection, but few explicitly require the dwelling to be inhabited at the time of entry, though some require occupancy.[2]  These approaches have the salutary advantage of simplicity as they avoid questions of intent and purpose that, as we shall see, complicate the question of determining whether a house is inhabited.

---

[2]  See, e.g., Alabama Code section 13A-7-5 (building must be a dwelling and occupied; construed in *Gaskin v. State* (Ala.Crim.App. 1974) 297 So.2d 388, 390); Alaska Statutes section 11.46.300 (occupied dwelling); Florida Statutes Annotated section 810.02 (burglary is "Entering a dwelling . . . with the intent to commit an offense"; construed in *Jacobs v. State* (Fla.Dist.Ct.App. 2010) 41 So.3d 1004 [the fact that the home had been unoccupied for years and remained so at the time of the crime does not rule out the building's status as a "dwelling"]); Iowa Code Annotated section 713.1 (punishes burglary of an "occupied structure," defined in Iowa Code Ann. § 702.12 as "any building [or] structure . . . adapted for overnight accommodation of persons"); Kansas Statutes Annotated former section 21-3715 (burglary a "person felony" if building is a "dwelling," defined in former § 21-3110(7) as "a building . . . which is used or intended for use as a human habitation, home or residence"); Missouri Annotated Statutes section 569.160 (" inhabitable structure"); North Carolina General Statutes section 14-51 (burglary when committed in a "dwelling house" with a person in actual occupation is first degree; if no occupant, second degree); Ohio Revised Code Annotated section 2911.12 (habitation when person is present or likely to be present); New York Penal Law section 140.30 (". . . knowingly enters or remains unlawfully in a dwelling with intent to commit a crime therein"; " 'Dwelling' means a building which is *usually* occupied by a person lodging therein at night" (N.Y. Pen. Law § 140.00)); Washington Revised Code Annotated section 9A.52.025 (". . . enters or remains unlawfully in a dwelling"; "dwelling" defined as ". . . any building or structure . . . which is used or ordinarily used by a person for lodging" (Wash. Rev. Code Ann. § 9A.04.110)).

California burglary law has never conformed perfectly to the common law, particularly in regard to the type of structure subject to burglary penalties. As our Supreme Court has noted, " 'Of all common law crimes, burglary today perhaps least resembles the prototype from which it sprang. . . .' [Citation.]" (*People v. Davis* (1998) 18 Cal.4th 712, 721.) And also, California has not followed the example of other states that make the enhanced punishment for burglary depend simply on the type of structure that is unlawfully entered.

With respect to California burglary statutes, "[t]he first definition of the offense found in our statute (1850, p. 235, Sec. 58) abolishes all the nice distinctions of the common law by the use of this language: 'Any dwelling house, or any other house whatever, or tent, or vessel or other water craft'—language broad enough to include buildings of any kind and used for any purpose. The statute was amended in 1858 . . . with the intent to leave it as broad as at first and to meet the doctrine advanced by some of the cases, that an entry into an unoccupied room or apartment of a dwelling house was not a burglary. Hence the word 'dwelling' was omitted, and the words 'room, apartment or tenement' added. While the language of the statute might have been made more definite and certain by employing words in common use, it could not well be made more comprehensive, and . . . the absence of more particular terms of description indicates an intention, on the part of the Legislature, to include every kind of buildings or structures 'housed in' or roofed, regardless of the fact whether they are at the time, or ever have been, inhabited by members of the human family. A house, in the sense of the statute, is any structure which has walls on all sides and is covered by a roof." (*People v. Stickman* (1867) 34 Cal. 242, 245.)

The language "any house, room, apartment, or tenement" became part of the original version of section 459 enacted in 1872. Amendments in 1875 added to the list of structures that were expressly protected "shop, warehouse, store, mill, barn, stable, outhouse, or other building." (Code Amends. 1875-1876, ch. 56, § 1, p. 111.) At the

same time, section 460, the punishment provision, was amended to distinguish between nighttime entries, which were punished as first degree burglary, and daytime entries, which were punished as second degree burglary. (Code Amends. 1875-1876, ch. 56, § 2, p. 112.)

Thus the concept of habitation, so critical to burglary at common law, was not central to burglary in California. All buildings were treated the same, that is, until 1923, when section 460 was amended to change the definition of first degree burglary to "burglary of an inhabited dwelling house or building committed in the night time." (Stats. 1923, ch. 362, § 1, p. 747.) The term "inhabited," left undefined by statute, was held to modify both dwelling house and building. (*People v. Warwick* (1933) 135 Cal.App. 476, 477.) Earlier cases held that a dwelling could be regarded as inhabited even if unoccupied so long as the owner's absence was only temporary. (*People v. Allard* (1929) 99 Cal.App. 591 (*Allard*); *People v. Hann* (1930) 104 Cal.App. 492.) But a building that was not a dwelling could only be considered inhabited if occupied at the time of the burglary. (*People v. Jones* (1926) 78 Cal.App. 683 [unoccupied railroad caboose]; *Warwick*, *supra*, 135 Cal.App. at p. 478.) In 1977 section 459 was amended to add a definition for inhabited: "As used in this section, 'inhabited' means currently being used for dwelling purposes, whether occupied or not." (Stats. 1977, ch. 690, § 3, p. 2220.)[3]

With the amendments in 1923 and 1977 California burglary law returned to its common law roots, centered on protection of habitation. After 1923 California cases expressed these policy moorings. As we observed in *People v. DeRouen* (1995) 38 Cal.App.4th 86 (*DeRouen*), disapproved on other grounds in *People v. Allen* (1999) 21 Cal.4th 846, 864, " ' "Burglary laws are based primarily upon a recognition of the

---

[3] In 1978 section 459 was amended to make the definition of "inhabited" applicable to "chapter" instead of "section."

dangers to personal safety created by the usual burglary situation—the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence." ' [Citation.] 'In addition, a burglary of an inhabited dwelling involves an invasion of perhaps the most secret zone of privacy, the place where trinkets, mementos, heirlooms, and the other stuff of personal history are kept. Society therefore has an important interest in seeing to it that burglars stay out of inhabited dwelling houses.' [Citation.]" (*DeRouen*, at p. 91.)

But California did not follow the approach of other states to premise its burglary protections on the design of the structure being entered or the occupancy of the building. Rather, for burglary of the highest degree, it is the nature of the current use of the building, which is to say the use at the time of the entry (*People v. Aguilar* (2010) 181 Cal.App.4th 966, 970-971) rather than the design of the building, its customary use, or its current occupancy that is important (see *People v. Hughes* (2002) 27 Cal.4th 287, 355-356 (*Hughes*)). By narrowing the scope of first degree burglary to encompass only dwellings and then restricting it further to include only those dwellings that are "inhabited," the drafters intended to sweep in more burglaries of the type considered especially despicable at common law while creating a different classification, with less severe punishment, for unlawful entries into uninhabited structures.

So what then does it mean to say that a home is "currently being used for dwelling purposes?" The People recognize that more is involved than design or functionality. According to the People, the answer is multifactored, with the most important factor being the intent of the victim. Relying heavily on a quartet of cases—*People v. Marquez* (1983) 143 Cal.App.3d 797 (*Marquez*); *People v. Cardona* (1983) 142 Cal.App.3d 481 (*Cardona*); *People v. Hernandez* (1992) 9 Cal.App.4th 438 (*Hernandez*); and *People v. Meredith* (2009) 174 Cal.App.4th 1257 (*Meredith*)—the People declare: " 'The dispositive element is whether the person with the possessory right to the house views the

9

house as his dwelling.' " (Quoting *Cardona*, *supra*, 142 Cal.App.3d at p. 484.) The quote is accurate and indeed the possessors' views were dispositive in the factual context of the cases cited, but the present factual context differs.

*Marquez* involved the burglary of a house owned by a woman who was confined to a boarding home at the time of the burglary. Her home was still furnished and maintained as a residence, and she hoped to return to the home in the future. The Court of Appeal concluded the house was inhabited, since there was no evidence the owner of the house or conservators acting on her behalf had ever vacated or abandoned her residence to live some other place. (*Marquez*, *supra*, 143 Cal.App.3d at p. 802.) In this respect, *Marquez* applies the rule first articulated in *Allard*, *supra*, 99 Cal.App. 591 that a temporary absence from a dwelling does not render it uninhabited. This court applied the same logic to vacation homes, where we noted "the distinction between an inhabited and uninhabited dwelling is pivotal in the law of burglary" (*DeRouen*, *supra*., 38 Cal.App.4th at p. 91) but concluded the "societal interests present in one's second or vacation home are equally as important as those present in one's primary residence" (*id*. at p. 92). We noted both homes contain personal items, and potential for personal harm from outside intrusion exists in both homes. "The seriousness of the crime does not turn on the fortuity of whether the occupant chose one home or the other on a particular day." (*Ibid.*)

Here, Noor rented the Michigan Avenue residence to Mattos in 2008. Noor had not lived in the residence since then. Instead, he lived with his family on Carmel Bay Road. Subsequent financial reversals and the loss through foreclosure of their Carmel Bay Road home led the Noors to change their housing plans, but there is no evidence that at the time they moved from the Michigan Avenue residence they intended to return. Mr. Noor was not resuming occupancy in a home filled with his furnishings after an extended absence. He was not shifting back and forth between two homes. Rather, all the evidence suggests he had moved permanently from the home he occupied on Carmel Bay Road, just as he had moved from his Michigan Avenue residence in 2008, and was

planning to commence a new period of occupancy and habitation in a different residence. The fact that he owned and earlier occupied this "new" residence does not invoke the principles articulated in the *Marquez* case or *DeRouen* or *Meredith*, *supra*, 74 Cal.App.4th 1257, whose facts are similar to those of *Marquez* but do not resemble the facts of this case.

The rule of *People v. Guthrie* (1983) 144 Cal.App.3d 832 best fits Mr. Noor's circumstance: a formerly inhabited dwelling becomes uninhabited when its occupants have moved out permanently and do not intend to return to continue or to resume using the structure as a dwelling. (*Id*. at pp. 838-840.)

With respect to the *Cardona* case, there is no doubt that intent can be an important factor in determining habitation. Where a tenant buys a new home and moves into it, disclaiming any plans to return to the rental home he lived in before, the rental home is no longer considered inhabited though his lease has not expired, and though his personal belongings temporarily remain in the home. (*Cardona*, *supra*, 142 Cal.App.3d 481.) The tenant's expressed intent prevails over the contrary evidence of intent presented by the continued presence of his belongings in the rental home and his continued right to possession of the home under an unexpired lease. If the lessons of *Cardona* have any application to the present case, it is that when Mr. Noor, upon purchasing another home, left the Michigan Avenue residence without current plans to return, he ceased to be a resident of the home though he had a right of possession. Like the homeowner in *Cardona*, he did not intend to return and his habitation ended.

*Meredith*, *Marquez,* and *Cardona* involved the question of when a current habitation ends and conclude it ends when the current inhabitant leaves with no plans to return, even though personal belongings remain in the dwelling and the legal right to possession has not ended. *Hernandez* involved the question of when habitation begins. In *Hernandez*, the court upheld a conviction for first degree burglary even though the victims of the burglary had just moved into the apartment, had not unpacked their

11

belongings, and had not yet slept there. As in *Meredith*, *Marquez*, and *Cardona*, all of the indicia of habitation were present except for the occupancy of the inhabitant at the time of the burglary. Under those circumstances, it is reasonable to observe that "[t]he dispositive element is whether the person with the possessory right to the house views the house as his dwelling." (*Cardona*, *supra*, 142 Cal.App.3d at p. 484.)

In the present case, none of the indicia are present except for the self-declared intent of the owner to occupy the house in the future. Only if we view the owner's reoccupation to a be a continuation of his former occupation following a temporary absence can it be plausibly asserted that the house was inhabited. Here, the owner never suggested at the time he moved out of his home that he intended to return and resume occupancy. The circumstances of his return—the loss of his home in foreclosure—were unplanned and unwanted.

Though we agree with the People that the facts of *Valdez* are not a perfect match, they are far closer to our facts than any of the cases cited in support of the People's position. In *Valdez*, *supra*, 203 Cal.App.2d 559, about a week after a tenant had removed his property and vacated the residence, and several days before a new tenant was scheduled to move into the residence, the defendant entered and took louvered doors and a cabinet. (*Id*. at pp. 561-563.) *Valdez* concluded that the residence was not inhabited at the time of the burglary and that the offense should have been limited to second degree, stating, "the dwelling in question was an unoccupied rental unit," "[n]o one was residing therein," the dwelling "was not the residence of a person who was temporarily absent," and the residence "was not the residence of the new tenant, of the landlord, or of the old tenant." (*Id*. at p. 563; see also *Hughes*, *supra*, 27 Cal.4th at p. 354.)

Whether a person inhabits a place—whether the person has made a place his or her place of residence—is a question of fact. The prosecution bears the burden of establishing beyond a reasonable doubt that someone inhabited the Michigan Avenue home. In reviewing a challenge to the sufficiency of the evidence, we "must review the

12

whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see *People v. Gonzales* (2012) 54 Cal.4th 1234, 1273.) Here, there is no evidence that the burglarized residence was inhabited, that it was currently being used by someone for dwelling purposes. Under established California precedent, it is not enough to show the home was suited for use as a residence and its owner had declared his intent to move in, or that it had been recently used or would be imminently used. Nor is there evidence that its owner was merely away temporarily.

## II

Defendant finally contends the prosecutor committed misconduct in his closing arguments in that he referred to evidence which was not admitted at trial and misstated the law. Our disposition on the sufficiency of the evidence on habitation renders moot defendant's claim of prosecutorial misconduct with respect to the prosecutor's misstatement of the law and facts related to whether the dwelling was inhabited. With respect to the prosecutor's statements concerning "Jamie" in closing arguments, we find any error harmless.

In opening statement, the prosecutor claimed that Davis and Langhorst would testify that Cummings and defendant explained they were looking for "Jamie," who lived at the residence. The prosecutor informed the jury there would be evidence that Jamie Pokrywka had a reason to tell Cummings and defendant that the residence would be empty if they wanted to take metal.

In opening statements, both defense counsel for defendant and Cummings' counsel stated their belief there would be evidence that "Jamie" used to live at the Michigan Avenue residence and that defendant and Cummings stopped to say hello to defendant's acquaintance.

13

At trial, Davis and Langhorst testified that defendant and Cummings claimed they were looking for Jamie. Jamie Pokrywka, their nephew's girlfriend who had stayed at the residence and helped clean in order for Mattos to get her deposit, knew the house would be empty. When Davis mentioned that Pokrywka had only one brother, Cummings claimed "Jamie" had another brother, suggesting they were talking about the same Jamie.

In closing argument, the prosecutor informed the jury that it was not permitted to consider whether Pokrywka would be prosecuted as well for the burglary. The prosecutor then stated that if she did anything, she might have told defendant and Cummings that the house would be empty. Defense counsel objected on the grounds of lack of evidence. The trial court instructed the jury that the point could be argued but that what the attorneys said was not evidence. The prosecutor reiterated that whatever Pokrywka did, if anything, was not important, but instead, defendant and Cummings committed the burglary. In rebuttal, the prosecutor argued that Pokrywka knew the house would be empty and that defendant and Cummings were looking for the same "Jamie."

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819 (*Hill*).)

"When the claim focuses on the prosecutor's comments to the jury, we determine whether there was a reasonable likelihood that the jury construed or applied any of the remarks in an objectionable fashion." (*People v. Booker* (2011) 51 Cal.4th 141, 184-185 (*Booker*); see *People v. Pierce* (2009) 172 Cal.App.4th 567, 572.)

14

The trial court did not err by overruling the defense objection to the prosecutor's argument.  There is not a reasonable likelihood the jury construed or applied the prosecutor's remarks in an objectionable fashion.  (*Booker, supra*, 51 Cal.4th at pp. 184-185.)  The prosecutor's argument was neither deceptive nor reprehensible, and it did not constitute misconduct.  (*Hill, supra,* 17 Cal.4th at p. 819.)

Based on the evidence presented, it was reasonable to infer that defendant and Cummings were looking for the same "Jamie" who was connected to the house, and it was further reasonable to infer that Jamie Pokrywka might have informed defendant and Cummings that the house would be empty.  Pokrywka had stayed in the residence with her boyfriend, knew that Mattos had moved out,  had helped clean the residence, and knew it would be empty until the owner moved in.  Cummings did not claim he and defendant were looking for a different "Jamie" but instead claimed she had another brother whom Davis and Langhorst did not know.  We find no misconduct.

## DISPOSITION

The jury's finding that the burglary was in the first degree is reversed.  The burglary is second degree.  The matter is remanded to the trial court for resentencing.  The judgment is otherwise affirmed.


                                                    RAYE          , P. J.



I concur:



        MURRAY        , J.




15

Nicholson, J., Concurring and Dissenting

I concur in part II of the majority's opinion, but I dissent as to part I. I would affirm the first degree burglary conviction.

I agree with the majority opinion's well-crafted summary of the statutory scheme and common-law underpinnings of first degree burglary under Penal Code sections 459 and 460. Nonetheless, I would reach a different conclusion in this case of first impression. I would hold that the burgled house was an inhabited dwelling because, at the time of the burglary, the owner intended to return to it as his residence.

Mersa Noor bought the house in question in 2006 or 2007 and lived in it. There can be no doubt that it was an inhabited dwelling then. In 2008, Noor moved out of the house and rented it to Barbara Mattos. There can also be no doubt that the house was an inhabited dwelling when Mattos lived in it. Then, in 2011, Noor decided to move back into the house, which required Mattos to move out. The burglary occurred after Mattos finished moving her belongings out of the house and before Noor started moving his belongings into the house. The house was not abandoned at that point; instead, it was merely in transition from the possession of a tenant back to possession of the owner.

In my view, this is akin to the vacation home scenario. (See *People v. DeRouen* (1995) 38 Cal.App.4th 86, 91-92, disapproved on other grounds in *People v. Allen* (1999) 21 Cal.4th 846, 866.) The owner uses it on occasion and may even rent it to others at times, but it never loses its character as an inhabited dwelling during that process. Though it is often unoccupied, it is still inhabited.

Where I depart from the majority's analysis is the timing of the owner's intent to return and occupy the house. The majority states that, for first degree burglary, the owner must intend to return when he moves out. While the cases cited by the majority state that the relevant intent is whether the owner intended to return to the house when the owner left it, those cases did not involve an owner who moved out without the intent to return

1

but developed the intent to return before the burglary.  (See *People v. Meredith* (2009) 174 Cal.App.4th 1257 [first degree burglary because owner intended to return when he moved out, even though owner may not have been able to return because he was on life support]; *People v. Hernandez* (1992) 9 Cal.App.4th 438, 441 [first degree burglary because residents had moved in belongings and intended to live there even though they had not yet slept there]; *People v Marquez* (1983) 143 Cal.App.3d 797, 800 [first degree burglary because, at time she left, owner intended to return to live there]; *People v. Cardona* (1983) 142 Cal.App.3d 481 [second degree burglary because owner had moved out with no intent to live there again]; *People v. Valdez* (1962) 203 Cal.App.2d 559, 563 [second degree burglary because no prior occupant intended to return].)  In other words, none of the cases is on point.

If, as the majority appears to agree, the dispositive consideration on the issue of whether the burgled house was an inhabited dwelling is whether the owner intended to return and make it his residence, it seems to me that the more relevant timing of the intent is at the time of the burglary, not at the time the owner moved out of the house.  I find it doubtful that the Legislature intended the first degree burglary statute to protect the owner's past intentions over the owner's present intentions.

" '[A]fter a man has established a house as his dwelling it retains this character so long as he intends it to be his place of habitation even though he and his entire household are away, unless it is actually taken from him against his will . . . .'  (Perkins on Criminal Law (2d ed. 1969) p. 203.)"  (*People v. Marquez, supra,* 143 Cal.App.3d at pp. 801-802.) "The dispositive element is whether the person with the possessory right to the house views the house as his dwelling."  (*People v. Cardona, supra,* 142 Cal.App.3d at p. 484.)

I believe the better position is that the house is an inhabited dwelling if, at the time of the burglary, the owner, who lived in the house before, intends to return and make it his home again.  I see no logical or policy reason to require that the owner's intent in the

2

past (when he left the house) prevail over the owner's present intent. Indeed, it is the owner's present intent to return to the house that makes the burglary more dangerous.

Here, there was sufficient evidence that, at the time of the burglary, Noor intended to move back into his house and make it, once again, his residence. The majority refers to the evidence as Noor's "self-declared intent . . . to occupy the house in the future." (Maj. opn. at p. 12.) I see no reason to depreciate the evidence in this fashion. After all, this is a sufficiency-of-evidence review. Noor said that, at the time of the burglary, he intended to move into the house in the near future. To me, that, combined with the fact that he had lived there before, made the house an inhabited dwelling.

NICHOLSON_____, J.

3