Filed 2/26/16  P. v. Robinson CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LAMONT ROYCE ROBINSON,<br><br>        Defendant and Appellant. | A139219<br><br>(Contra Costa County<br>Super. Ct. No. 51303635) |

Lamont Royce Robinson appeals from a judgment upon a jury verdict finding him guilty of first degree burglary (Pen. Code,[1] §§ 459/460, subd. (a)).  In a bifurcated proceeding, the court found that defendant suffered a prior prison conviction within the meaning of section 667.5, subdivision (b).  Defendant contends that the evidence was insufficient to support the verdict because the house was not inhabited at the time of the burglary.  He also raises several additional issues including that the prosecutor committed misconduct in misstating the law on the issue of whether the house was inhabited and in his explanation of the reasonable doubt standard.  We affirm.

## I.  FACTS

In November 2012, Isaack Martinez purchased a house on Virginia Avenue in Richmond.  Prior to moving in, Martinez, together with his uncle and some friends, worked to fix up the house.  They were at the house on the weekends and on some weekday afternoons. As of December 18, 2012, only the floors and a couple of little

---

[1] All further statutory references are to the Penal Code.

1

things remained to be completed. Martinez had already painted the bathroom and outside of the house and installed an alarm system. He also had the utilities connected. In addition, he was storing some couches and tables in the garage. His other furniture and personal belongings were at his mother's house, where he and his family were staying while he remodeled the Virginia house. They planned to move in before Christmas.

In the early morning hours of December 18, 2012, Martinez was informed that someone had burglarized his house. When he arrived at the house, the police showed him that the kitchen window had been broken and the alarm system had been torn out of the wall. Martinez had set the alarm and locked the sliding glass door in the back of the house before leaving. A tool bag containing tools belonging to Martinez's uncle, including a power drill and a water pump he kept in the house, were in the back yard. A crowbar was also found in the back yard; it did not belong to Martinez.

Officer David Longacre was on patrol duty at approximately 4:00 a.m. on December 18, 2012 when he responded to an alarm call at the Virginia house. Upon arrival, he heard the sound of a metal object hitting the ground behind the front gate on the right side of the house, followed by the sound of another object hitting the ground. Longacre ordered the person on the other side of the gate to come out. When no one responded, he ordered the person a second time. Defendant opened the gate and stepped toward Longacre. The gate closed behind defendant, and Longacre heard footsteps running away behind the gate.

Longacre handcuffed defendant and searched him. He found a large pair of pliers and a multi-head screwdriver in defendant's pants pockets. He placed defendant under arrest and put him in his patrol car. Longacre then went through the gate and immediately saw a metal crowbar, an illuminated headlamp, a bag of new window coverings, and a roll of speaker wire on the ground. In the rear of the house, he found a black duffel bag and a backpack lying on the ground. The duffel bag contained a skill saw, a power drill, a water pump, and some fluorescent light bulbs. The backpack had small hand tools. Longacre also observed that a stool had been propped up next to the rear of the house just below the kitchen window. The kitchen window was broken and

2

the rear sliding glass door was open. Inside the house, Longacre saw that the wiring to the alarm control panel had been ripped out and was lying on the floor.

The prosecution also produced evidence of three prior burglaries committed by defendant for the purposes of showing his intent to commit theft and plan to commit burglary.

## II. DISCUSSION

### A. Sufficiency of the Evidence of Burglary

Defendant contends that the evidence was insufficient to support the jury's verdict of first degree burglary because the evidence was inadequate to prove that the Virginia house was inhabited.

To constitute burglary in the first degree, the dwelling must be inhabited. (§ 459.) The term inhabited means "currently being used for dwelling purposes, whether occupied or not." (*Ibid.*) "[A] house remains inhabited even if the burglary occurs while the residents are away for an extended period of time." (*People v. Cardona* (1983) 142 Cal.App.3d 481, 483.)

" ' "Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation—the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence." ' " (*People v. DeRouen* (1995) 38 Cal.App.4th 86, 91 (*DeRouen*); overruled on other grounds in *People v. Allen* (1999) 21 Cal.4th 846, 864, 867.) "Whether a person inhabits a place—whether the person has made a place his or her place of residence—is a question of fact. The prosecution bears the burden of establishing beyond a reasonable doubt that the [burglarized house was inhabited]." (*People v. Burkett* (2013) 220 Cal.App.4th 572, 582.)

We review the judgment under the substantial evidence standard. (*People v. Hatch* (2000) 22 Cal.4th 260, 272.) Under this standard, we must review " 'the whole record in the light most favorable to the judgment' and decide 'whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty

3

beyond a reasonable doubt.' " (*Ibid., quoting People v. Johnson* (1980) 26 Cal.3d 557, 578.) If the circumstances reasonably justify the verdict, we cannot reverse merely because a contrary finding might also be reasonably deduced from the circumstances. (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) We will reverse only if it "clearly appear[s] that upon no hypothesis whatever is there sufficient substantial evidence to support [the judgment]." (*Ibid.*)

Defendant contends that the evidence showed the Virginia house was uninhabited because Martinez and his family lived elsewhere, and they had not yet moved into the house. Defendant's theory, however, ignores substantial evidence in the record establishing habitation.

*People v. Marquez* (1983) 143 Cal.App.3d 797, 801–802 (*Marquez*) is instructive. There, the owner of the property, who was under a conservatorship, was living in a boarding home at the time of the burglary, and it was uncertain whether she would return. (*Id.* at p. 801.) The home, however, continued to be maintained on a daily basis. (*Id.* at pp. 800–801.) The court explained that the intent of the occupier or the person entitled to occupy the house was determinative in deciding whether the dwelling was inhabited within the meaning of section 459. (*Id.* at p. 801.) The court upheld the trial court's finding that the house was inhabited because the owner intended to return and there was no evidence that she vacated or abandoned the property. (*Id.* at p. 802; see also *People v. Glazier* (2010) 186 Cal.App.4th 1151, 1154, 1161 [house inhabited even though residents were staying with relatives while their house was being remodeled]; *People v. Hernandez* (1992) 9 Cal.App.4th 438, 442 (*Hernandez*) [apartment inhabited where residents had not slept there but moved their belongings into the apartment, intended to occupy it, and had utilities connected.)

Here, the evidence was sufficient to support a finding that the house was inhabited within the meaning of the statute. Martinez had already moved some of his belongings into the house. The water and electricity had already been turned on. Martinez had installed a burglar alarm system, had already painted the bathroom and outside of the house, and spent time at the house on weekends and some weekdays

4

making renovations to the house. Although he and his family had not yet slept there, their temporary absence was not determinative. (*Marquez, supra,* at p. 802 ["It is the intent and not the length of absence which controls."]; *People v. Hughes* (2002) 27 Cal.4th 287, 354 (*Hughes*) ["[t]he use of a house as sleeping quarters is not determinative, but instead is merely a circumstance used to determine whether a house is inhabited"].) That Martinez had connected the utilities and installed a burglary system is significant. The latter reflects that Martinez had a reasonable expectation of protection in his home from unauthorized intrusion. (*DeRouen, supra,* 38 Cal.App.4th at pp. 91–92 [proper question is whether nature of structure is one in which a reasonable person would expect some protection from unauthorized intrusion], see *Hughes, supra,* 27 Cal.4th at pp. 354–355 [evidence sufficient to support inhabited dwelling burglary even though victim had begun to move to her boyfriend's home and slept there where her furniture and personal belongings remained in the apartment and utilities remained on—victim's presence increased the risk of personal injury and confrontation during a burglary].) In this case, it was reasonable for a jury to find Martinez inhabited the home based on his consistent presence on weekends and some weekdays, his use of the house by moving in some belongings, his turning on the utilities, and making renovations including the installation of a burglar alarm, and on his intent to move in with his family in less than a week. Because we conclude that substantial evidence supports the jury's implied finding of habitation, we need not reach defendant's claim that he was denied his due process right to proof beyond a reasonable doubt of this element of the charge.

### B. *Prosecutorial Misconduct*

Defendant also argues that the prosecutor committed prosecutorial misconduct during closing arguments because he misstated the law on the element of an inhabited dwelling. In particular, defendant asserts that the prosecutor improperly argued that "whether or not it's inhabited turns on the intention of the person who owns it. If you intend to return to it, if you intend to use it as your home, if you intend to live there, if it is your property and you intend for it to be your home, that's an inhabited dwelling." Defendant also faults the prosecutor for arguing that "it's not about the property. It's not

5

about the stuff that you may have in it or in some cases not have in it . . ." and in stating that "[t]here is no requirement that you be spending the night somewhere. There's no requirement that you actually have a bed in a place in order for it to be inhabited . . . . It's about what you intend to use this property for, if you intend it to be your home." Additionally, defendant argues that the prosecutor improperly stated, "Inhabited is not about having a bed. It's not about sleeping there. And the law is very clear about that because if that was the case, that would be the way it's worded. And it's not."

" '[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. . . .' " (*People v. Hill* (1998) 17 Cal.4th 800, 829 (*Hill*).) Prosecutorial misconduct requires reversal only when, viewing the record as a whole, it results in a miscarriage of justice. (*People v. Green* (1980) 27 Cal.3d 1, 29 overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 234.)

Here, the prosecutor's comments did not constitute a misstatement of the law. Rather, the law, as stated above, considers the intent of the resident in determining whether he or she inhabited the residence. (*Marquez, supra,* 143 Cal.App.3d at p. 801.) And, as the prosecutor argued, whether the resident has slept at the premises is not determinative. (*Hughes, supra,* 27 Cal.4th at p. 354.) Notwithstanding that the prosecutor's arguments did not constitute a misstatement of the law, the court admonished the jury on more than one occasion that the prosecutor's statements were argument and that instruction on the law would be given by the court.

Defendant also contends that the prosecutor's argument improperly focused on the occupant's future intent rather than the current use of the property. The court, however, properly instructed the jury that "[a] house is inhabited if someone uses it as a dwelling, whether or not someone is inside at the time of the alleged entry." The instruction correctly focused on the present rather than future use of the property. (§ 459 [" 'inhabited' means currently being used for dwelling purposes"].) We must presume that the jury understood and correlated the court's instructions. (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)

6

On the record before us, we conclude there was no miscarriage of justice. The jury was admonished to take its instructions from the court. Given the admonitions and instructions by the court, it is not reasonably probable that defendant would have achieved a more favorable result absent any misconduct. (*People v. Strickland* (1974) 11 Cal.3d 946, 955.)

### C. Jury Instructions

Defendant further argues that the court erred in its instructions to the jury on the meaning of the habitation element of burglary. He refers to the court's response to the jury's question of whether it could use "<u>intent</u> to dwell to determine if a dwelling is occupied or inhabited." The court responded to the jury's question by stating that "[t]he Court of Appeal cases that define an 'inhabited house' (see [CALCRIM No.] 1701) have looked at many factors" and referred it to a summary of the law on first degree burglary from *People v. Rodriguez* (2004) 122 Cal.App.4th 121, 132 (*Rodriguez*): "First degree burglary is defined as 'burglary of an inhabited dwelling house, vessel, . . . which is inhabited and designed for habitation, floating home, . . . or trailer coach, . . . or the inhabited portion of any other building . . . .' (§ 460, subd. (a).) Section 459 defines 'inhabited' as 'currently being used for dwelling purposes, whether occupied or not.' ' "[I]nhabited dwelling house" means a structure where people ordinarily live and which is currently being used for dwelling purposes. [Citation.]' (*People v. Fleetwood* (1985) 171 Cal.App.3d 982, 987.) CALJIC No. 14.52 provides that an 'inhabited dwelling house' is 'a structure which is currently used as a dwelling whether occupied or not.' [¶] For purposes of the California first degree burglary statute, a structure 'need not be occupied at the time; it is inhabited if someone lives there, even though the person is temporarily absent.' (2 Witkin & Epstein, Cal. Criminal Law [(3d ed. 2000)] Crimes Against Property, § 114, p. 144; see [*Hughes*, *supra*,] 27 Cal.4th [at pp. 354–355] [apartment was inhabited even though occupant was in process of moving; her furnishings remained there, and she was present in apartment during daytime hours]; [*Hernandez*, *supra*,] 9 Cal.App.4th 438 [apartment was inhabited when tenants moved all of their belongings into it, but had not yet slept in it or unpacked]; *People v. Jackson*

(1992) 6 Cal.App.4th 1185 [dwelling continued to be inhabited because tenant who intended to move out had not vacated premises and was still using the house at time of robbery]; [*Marquez*, *supra*,] 143 Cal.App.3d [at pp. 800, 802] [house inhabited even though resident, under conservatorship, had been absent for two and a half years, because resident intended to return]; CALJIC No. 14.52 ['[an inhabited dwelling house] is inhabited although the occupants are temporarily absent'].)  A structure that was once used for dwelling purposes is no longer inhabited when its occupants permanently cease using it as living quarters, and no other person is using it as living quarters.  (*People v. Cardona* (1983) 142 Cal.App.3d 481, 483 [house no longer inhabited when residents had moved and no identifiable person was currently using it as sleeping quarters]; *People v. Valdez* (1962) 203 Cal.App.2d 559 [house not inhabited when previous tenant had moved out a week earlier and new tenant had not moved any belongings into house].)"

The jury also asked for the legal definition of a dwelling.  The court responded, quoting section 459, that "[the statute] states a house is currently being used for dwelling purposes if, at the time of the burglary, it was not occupied solely because a natural or other disaster caused the occupants to leave the premises."

Defendant argues that the court's instructions erroneously permitted the jury to focus on the future use of house and allowed the jury to find habitation based on insufficient evidence.  This argument lacks merit.

The correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction, or from a particular instruction.  (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.)  Here, the court's instructions correctly set forth the law on first degree burglary and informed the jury that it was to consider whether the dwelling was currently being used for dwelling purposes. (§ 459; see CALCRIM No. 1701, *Rodriguez, supra,* 122 Cal.App.4th at p. 132.)  No additional instructions were warranted.  Had defendant believed that the jury required further clarification on the law of burglary, it was incumbent on him to request an

8

additional or clarifying instruction.[2]  (*People v. Carpenter* (1997) 15 Cal.4th 312, 391–392.)  In light of the cohesive, extensive instructions given to the jury, the arguments of counsel, and the entire record of the trial, it is not reasonably likely that the jury either misunderstood or misapplied the law of burglary.

### D.  Reasonable Doubt

Finally, defendant argues that the prosecutor committed misconduct during voir dire and in closing argument because he misstated the law on the reasonable doubt burden of proof.  Defendant's claim does not withstand scrutiny.

" 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' [Citation.]" (*Hill, supra,* 17 Cal.4th at p. 820, quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 841.)  Here, defendant did not object to the alleged misconduct below; we, however, review the issue in light of the fact that defendant claims his trial counsel was ineffective for failing to object to the prosecutor's comments.

Defendant argues that the prosecutor, in using three hypotheticals during his voir dire of the jury, misstated the law and conditioned the jurors to apply a lower standard of proof.  First, in attempting to explain circumstantial evidence, the prosecutor gave a hypothetical that his aunt left a tray of brownies on the kitchen table and told Anna, his 6-year-old cousin, not to eat them.  After going outside, the aunt returns and finds a couple of brownies missing.  There are Legos on the table near the tray, and a trail of brownie crumbs leading to Anna's bedroom.  The aunt finds Anna with a "milk mustache" and brownie crumbs on her.  Anna denies taking the brownies and blames the theft on Olive, the dog.  In discussing the hypothetical with the jurors, the prosecutor states the reasonable doubt standard of proof and then adds, "But it's not beyond all possible doubt, all possible scenarios, the reasonable scenarios.  It's a reasonableness standard.  [¶] So

---

[2] Defendant acknowledges that the colloquy between the parties and the court concerning the jury's questions was not reported.  Hence, we cannot determine whether defense counsel objected to or acquiesced in the court's instructions.

just because something is possible doesn't necessarily make it reasonable. [¶] So in your mind, going back to Anna and the brownies, is it reasonable that it was Olive based on the fact that we have the Lego[s], we have the trail of [brownie] crumbs, we have [the] milk mustache and brownie crumbs on her, is it still reasonable that Anna did not take the brownies?" The prosecutor then questioned the jurors on whether it was reasonable to find that Anna or Olive took the brownies.

The prosecutor subsequently presented a hypothetical about a woman being dropped off at the airport with her suitcase and a shoulder bag. A man and two kids, who were in the car with her, get out and give her a hug before she enters the airport. The prosecutor then asked the jurors whether they could determine whether the woman intended to go on an airplane from the circumstantial evidence. He explained that "the law says when you are presented with two possible scenarios and one of them points to guilt and the other one points to innocence, if they're both reasonable explanations you have to disregard the one that points to guilt and accept the one that points to innocence."

In the third hypothetical, the prosecutor asked whether his cup contained water or vodka. The prosecutor questioned the jurors on whether it was reasonable to conclude he had vodka in his cup, and again reiterated that he was required to prove every element of the crime of burglary beyond a reasonable doubt.

We agree with defendant that this kind of discursive use of rather simplistic hypotheticals is not a useful method of explaining the reasonable doubt standard and should be avoided. (*People v. Johnson* (2004) 119 Cal.App.4th 976, 986 [" '[T]he term "reasonable doubt" best defines itself' "].) In *People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*), our Supreme Court discouraged the use of hypotheticals and diagrams in explaining the concept of reasonable doubt in argument. The court recognized the " 'difficulty and peril inherent in such a task' " and discouraged these types of experiments by courts and prosecutors. (*Ibid.*)

In *Centeno*, the Court held that the prosecutor committed misconduct in relying on a diagram, that looked like the state of California even though there were some inaccuracies, to explain the concept of reasonable doubt. The prosecutor argued that

10

despite the incomplete and inaccurate descriptions in the map, it was clear beyond a reasonable doubt that the state depicted was California. Our Supreme Court concluded that the argument constituted prejudicial misconduct: "The use of an iconic image like the shape of California or the Statue of Liberty, unrelated to the facts of the case, is a flawed way to demonstrate the process of proving guilt beyond a reasonable doubt. These types of images necessarily draw on the jurors' own knowledge rather than evidence presented at trial" and encourage "jurors to guess or jump to a conclusion." (*Id.* at p. 669.) The Court also faulted the prosecutor for suggesting that as long as her interpretation of the evidence was reasonable, the People had met their burden of proof. (*Id.* at pp. 672–673.) "[T]he prosecutor did not simply urge the jury to ' "accept the reasonable and reject the unreasonable" ' in evaluating the evidence before it. [Citation.] Rather, she confounded the concept of rejecting unreasonable inferences, with the standard of proof beyond a reasonable doubt. She repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence. These remarks clearly diluted the People's burden." (*Id.* at p. 673.) The Supreme Court reversed the judgment because it was a close case and the trial court did not admonish the jury or reinstruct on the concept of reasonable doubt, leaving the prosecutor's argument on the law as the last word on the subject. (*Id.* at p. 677.)

Here, the prosecutor did not misstate the law. Instead, he attempted to explain the concept of circumstantial evidence, urged the jurors to accept the reasonable interpretation in his hypotheticals, and in the process told the jurors that he had the burden of proving all of the elements of a crime beyond a reasonable doubt. Unlike in *Centeno*, the prosecutor did not confound the concept of reasonable and unreasonable interferences with the reasonable doubt burden of proof. Rather, he paraphrased the CALCRIM No. 224 instruction on circumstantial evidence and told the jury that "the law says when you are presented with two possible scenarios and one of them points to guilt and the other one points to innocence, if they're both reasonable explanations you have to disregard the one that points to guilt and accept the one that points to innocence."

11

*Hill, supra,* 17 Cal.4th at p. 831, upon which defendant relies, is also distinguishable. There, the prosecutor told the jury during his closing argument that in determining reasonable doubt there had to be some evidence on which to base a doubt. (*Ibid.*) Our Supreme Court held that the prosecutor committed misconduct by misstating the law insofar as her statements could be interpreted as suggesting to the jury that defendant had the burden of producing evidence to demonstrate a reasonable doubt. (*Id.* at pp. 831–832; see also *People v. Lloyd* (2015) 236 Cal.App.4th 49, 63 [prosecutor misstated the law and reduced prosecution's burden of proof by arguing that not guilty means the defendant is innocent and that defendant was required to establish self-defense to be entitled to acquittal].)

Here, the prosecutor's comments on the concepts of circumstantial evidence and the reasonable doubt burden of proof were not erroneous statements of law. To the contrary, the prosecutor explained these concepts during his voir dire of the jury by paraphrasing the court's instructions. Moreover, the court read the reasonable doubt instruction midway through voir dire, on the prosecutor's request, and the court gave the standard instructions on reasonable doubt. The court also admonished the jury that it was required to take its instructions from the court and to disregard any contradictory instructions from counsel. We have reviewed the record of the voir dire and the parties' closing arguments,[3] and even if the prosecutor erred in any of his comments on the

_____

[3] Defense counsel, in arguing about reasonable doubt during closing argument, stated, "if you wish you had something more, then you have reasonable doubt . . . ." The prosecutor objected to "that qualification of reasonable doubt." The court responded, "That last part about wishing you had something more is probably not legally qualified as reasonable doubt." Defense counsel continued with his closing, arguing "if you need more evidence to convince you beyond a reasonable doubt, then you have a reasonable doubt . . . ." The court's ruling was not erroneous. Defense counsel's comment about wishing for "something more" was not an accurate statement of the reasonable doubt instruction, which states, "[t]he evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." (CALCRIM. No. 103.) By sustaining the prosecutor's objection, the court in effect left the jury with standard reasonable doubt instructions and necessarily precluded it from engaging in "fanciful

12

reasonable doubt burden of proof, given the admonitions and instructions by the court, it is not reasonably probable that defendant would have achieved a more favorable result absent any misconduct.  (*People v. Strickland, supra,* 11 Cal.3d at p. 955.)

## III.  DISPOSITION

The judgment is affirmed.

_____
Rivera, J.

We concur:

_____
Ruvolo, P.J.

_____
Reardon, J.

---

conjecture." (See *Victor v. Nebraska* (1994) 511 U.S. 1, 20 [distinguishing reasonable and substantial doubt from fanciful conjecture].)

13