Filed 2/25/21  In re M.U. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re M.U., a Person Coming Under the Juvenile Court Law. | B302971 |
| _____ | (Los Angeles County Super. Ct. No. YJ39345) |
| THE PEOPLE, | |
| Plaintiff and Respondent, | |
| v. | |
| M.U., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Morton Rochman, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Stephanie C. Brenan and Toni R. Johns Estaville, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

# INTRODUCTION

The juvenile court sustained a petition under Welfare and Institutions Code section 602, finding true that M.U. committed first degree residential burglary and possession of a firearm by a felon.

M.U. makes two arguments on appeal. First, he contends the first degree burglary conviction must be modified to second degree because there is no substantial evidence that the residence in question was *inhabited* at the time of the burglary. Second, he contends there is insufficient evidence he was *a felon* in possession of a firearm because he had never suffered a prior felony conviction.

We agree with M.U.'s second contention, and reverse the adjudication order as to that count only. In light of this, we remand the case to juvenile court with directions to recalculate the maximum term of physical confinement and amend its dispositional order accordingly.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts relevant to M.U.'s appeal are brief and undisputed.

At about 12:30 p.m. on June 18, 2019, Lance Grandison noticed four persons in a Black Hyundai Sonata drive up to his neighbor's house, stay a few minutes, and then drive off. His neighbor is Clarence Brown, a 95-year-old World War II veteran who had lived in the neighborhood for a long time, but was not in the house at the time.

About 10 minutes later, Lance noticed the same vehicle return. Lance and his wife Maria observed three young males step out of the car, approach the side of Clarence Brown's house,

look through the kitchen window, and proceed toward Brown's backyard. Lance and Maria next heard glass breaking. Maria called 911.

About 20 to 30 minutes later, Lance and Maria observed the three males come out of the front door and run toward the street, each holding firearms. Lance confronted them and took photographs of them as they ran to their car; he also took photographs of their car as they drove off. Maria called 911 once more and reported the license plate number of the black Sonata.

At approximately 1:15 p.m. that afternoon, an officer and detective with the Long Beach Police Department observed the black Sonata with the reported license plate number arrive and park in the driveway of a residence on West 57th Street. Minor I.H. was observed exiting the vehicle's driver side; he carried several rifle bags from the car to the house; he returned a minute later and grabbed more bags out of the car and went back toward the house. I.H. then returned to the black Sonata and drove away.

The black Sonata returned 20 minutes later. I.H. and 16-year-old appellant M.U. were observed exiting the car; they walked over to a blue Impala parked on the same street, and sat in the car. They were detained and arrested shortly thereafter. The arresting officers found a black rubber glove labeled "Gorilla Grip" in M.U.'s pocket and a "center punch" (a tool used to shatter glass quietly) on I.H.

The officer searched the exterior of the property and recovered what appeared to be the same firearm and firearm bags I.H. was observed carrying toward the house; they were hidden in a crawlspace underneath the house. A bolt-action rifle in a dark round bag was also recovered.

3

Clarence Brown's daughter Cynthia Herbert was contacted by telephone and arrived at her father's home to find "everything in such disarray and discovered the break-in [and] the burglary." The French doors in the rear were broken down, the alarm system was shattered, drawers and cabinets were overturned. Cynthia identified personal items belonging to her father that were missing—a ring, a watch, and three or four guns (including a handgun, a shotgun, and a rifle). Cynthia was later called to identify the recovered property; she identified one of her father's guns.

On June 21, 2019, the People filed a petition alleging M.U., a minor, committed one count of first degree residential burglary in violation of Penal Code[1] section 459 (count 1), and one count of possession of a firearm by a felon in violation of section 29800, subdivision (a)(1) (count 2).

In support of count 2, the district attorney provided the court with a certified minute order dated December 17, 2018, for Los Angeles Superior Court case No. YJ39345, adjudicating M.U. guilty of grand theft (a felony) in violation of section 487, subdivision (c), as alleged in a petition filed September 14, 2017.

During the proceedings, the following relevant testimony was elicited.

Lance testified he knew Clarence Brown was not at his house at the time of the incident.

Lance's wife Maria testified no one was living at the neighbor's house on June 18, 2019—the day of the incident. Maria further testified Clarence Brown lived alone at the house, but "ha[d]n't been in the home for a little while" since he "went

---

[1]     All further undesignated statutory references are to the Penal Code.

4

into the V.A. home"; she did not know *when* he had gone to the Veterans Administration (V.A.) home.

Cynthia testified she lived at her father's property "most of [her] life until [she] became an adult." She stated the "home is [her] property now. It belonged to [her] father" but she obtained power of attorney and now takes care of the house. She sporadically returned to the house, "usually at least once a month, sometimes more often than that." Prior to the June 18, 2019 incident, Cynthia had last gone to the house just six days prior—on June 12th. The home is completely furnished; there is running water and all the utilities are on (she "never turned anything off"). She has her gardener there "at least once a week" to clean the front yard and lawn. Cynthia testified her niece stayed at the house and lived there for a while.

After a contested adjudication, on November 12, 2019, the juvenile court sustained the petition, found M.U. guilty of both counts, and declared M.U. a person described by Welfare and Institutions Code section 602.

During the November 14, 2019 dispositional hearing, the court ordered the "[c]ustody of minor . . . taken from the parents" and "placed in the care, custody and control of the Probation Officer." The court ordered M.U. placed in the camp community placement program for a five to seven-month term—the "maximum confinement time."

M.U. filed a timely notice of appeal.

## DISCUSSION

A.   *Substantial Evidence Supports the First Degree Burglary*
     *Conviction in that the Residence was an Inhabited Dwelling*

M.U. challenges the sufficiency of the evidence to support his conviction for first degree burglary because he contends the evidence shows "the premises in question were not an inhabited dwelling house" within the meaning of section 459 at the time of the burglary. He argues the evidence shows "unequivocally that no one had lived at the house" and that it was "not occupied" on the date of the incident. He concludes adjudication should have been limited to burglary in the second degree, not first.

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find [M.U.] guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) We will reverse only if " 'it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the [judgment]." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Because M.U. challenges the sufficiency of the evidence concerning only the "inhabited dwelling" element of first degree burglary, the scope of our review is similarly limited.

Section 459 provides that a person is guilty of burglary if he "enters any house, room, apartment, . . . or other building . . . with intent to commit grand or petit larceny or any felony." (§ 459.) Burglary of an *inhabited dwelling house* is burglary of the first degree; all other kinds of burglary are of the second degree. (§ 460, subds. (a) & (b).) Section 459 defines "inhabited"

6

as "currently being used for dwelling purposes, whether occupied or not."

M.U. argues the evidence shows neither Clarence Brown nor his daughter Cynthia inhabited or occupied the house on the date of the burglary—June 18, 2019. He contends the evidence shows Brown had "moved into" the V.A. home prior to the burglary date and was no longer living there. He refers to testimony by Maria (the neighbor) who stated no one was living at Brown's house on that date. Maria had further testified that Clarence Brown lived alone at the house, but "ha[d]n't been in the home for a little while" since he "went into the V.A. home."

M.U. posits that even if Clarence Brown "retained any possessory rights to the house . . . , which is unclear, there was no suggestion the 95 year old intended ever to live there again." He compares Cynthia and her father Clarence to the son and elderly father in *People v. Meredith* (2009) 174 Cal.App.4th 1257, 1260, where the elderly father—suffering from dementia and age-related physical problems—was transferred to a nursing facility. The son stated his father "was 'adamant that all of his things stayed just the way they are' because 'he was planning on coming back.'" (*Ibid.*) M.U. argued there was no evidence in the case before us to suggest Clarence Brown would return to inhabit the property for dwelling purposes.

M.U. next argues the house was also neither inhabited by nor used for dwelling purposes by Cynthia. He referred to Cynthia's testimony that the home "belonged to [her] father" but is her property now. She obtained power of attorney and now "took care of" the house. While she checked the house "sporadically" and maintained the house, its furniture and utilities, and paid for weekly service by her gardener, M.U.

7

contends "the test is not whether there is furniture or possessions in the house but whether the person with the possessory right intends to occupy it." M.U. argues the evidence does not show Cynthia had any intention of occupying the house.

Respondent disagrees and argues Clarence Brown's home retains its character as an inhabited dwelling, despite the fact it was unoccupied on the date of the incident. Respondent compares the facts of this case to *People v. Marquez* (1983) 143 Cal.App.3d 797 (*Marquez*). In *Marquez*, the burglary took place in a house "[n]o one was living in." (*Id*. at p. 799.) The house was owned by a woman (Emma) in a conservatorship who was "confined to a boarding residence." (*Ibid*.) She had not lived in the house for at least a year or two. (*Id*. at pp. 799–800.) Her friend took care of the house. (*Id*. at p. 800.) The reviewing court in *Marquez* aptly framed the issue as "whether a dwelling can be considered 'inhabited' where the resident has moved to a boarding home, has had a conservatorship appointed over her, the house is being maintained, and *there is a doubt she will return*." (*Id*. at p. 801, italics added.) We agree with respondent that this case controls, based on the similarity of its facts to the case before us.

The *Marquez* court held we must look to the intent of the occupier or person entitled to occupy the dwelling to determine if it is inhabited within the meaning of section 459. (*Marquez*, *supra*, 143 Cal.App.3d at p. 801.) To that end, the court provided: " '[A]fter a man has established a house as his dwelling[,] it retains this character so long as he intends it to be his place of habitation even though he and his entire household are away.' " (*Id*. at pp. 801–802.)

The court of appeal in *Marquez* noted section 459 includes a definition of "inhabited": " 'As used in this chapter, "inhabited" means currently being used for dwelling purposes, whether occupied or not.' " (*Marquez*, *supra*, 143 Cal.App.3d at p. 801.) It also noted that a dwelling house is inhabited even though the occupant is temporarily absent. The inhabited-uninhabited dichotomy turns not on the immediate presence or absence of some person but rather on the character of the use of the building. It is the present use rather than the past or future intended use which is determinative. (*Ibid.*)

In *Marquez,* there was no evidence in the record that Emma, or conservators acting on her behalf, ever vacated or abandoned her residence to live in some other place. (*Marquez*, *supra*, 143 Cal.App.3d at p. 802.) Because there was no evidence of abandonment, the court inferred Emma intended to return, even though it was doubtful that she would. "It is the intent and not the length of absence which controls." (*Ibid*.) Despite Emma's absence, the building retained its character and use as an inhabited dwelling.

Just as Emma resided at a boarding residence but had her friend maintain and check on her house, Clarence Brown stayed at a V.A. home, but had his daughter Cynthia check on the house at least once a month, maintain his furniture and belongings, ensure the utilities functioned, and arrange for weekly care of the front yard by a gardener. The house retained its character and use as an inhabited dwelling. While M.U. argues "there was no suggestion the 95 year old intended ever to live there again," the court of appeal in *Marquez* noted the same regarding Emma, commenting that "there is a doubt she will return" from the boarding home. (*Marquez*, *supra*, 143 Cal.App.3d at p. 801.)

9

Based on the record, we conclude substantial evidence supports M.U.'s first degree burglary of an *inhabited* dwelling house within the meaning of section 459.

B.     *There is No Evidence M.U. was a Felon in Possession of Firearm as He Has Not Sustained a Prior Felony Conviction.*

Next, M.U. argues there is insufficient evidence he was in possession of a firearm because he has never suffered a prior felony conviction. Respondent concedes this point, and we agree, for the following reasons.

The petition filed June 21, 2019 alleged M.U. committed one count of possession of a firearm by a felon in violation of section 29800, subdivision (a)(1). However, section 29800, subdivision (a)(1) applies only to those previously *convicted* of a felony or of an offense enumerated in section 23515, subdivisions (a), (b), or (d). (§ 29800, subd. (a)(1).)

The People provided the juvenile court with a certified minute order dated December 17, 2018, for Los Angeles Superior Court case No. YJ39345, adjudicating M.U. guilty of grand theft (a felony) in violation of section 487, subdivision (c), as alleged in a petition filed September 14, 20177 However, an "order *adjudging* a minor to be a ward of the juvenile court shall not be deemed a *conviction* of a crime for any purpose, nor shall a proceeding in the juvenile court be deemed a criminal proceeding." (Welf. & Inst. Code, § 203, italics added.) Furthermore, nothing in the language of section 29800, subdivision (a)(1) indicates that the requirement of a felony *conviction* is satisfied by a juvenile *adjudication* of a felony offense. Accordingly, count 2 must be reversed.

10

## DISPOSITION

The November 12, 2019 adjudication order is reversed as to count 2. On remand, the juvenile court is directed to recalculate the maximum term of physical confinement and amend its dispositional order accordingly. The juvenile court is further directed to forward copies of all such pertinent documents to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities. In all other respects, the adjudication order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, J.

We concur:



GRIMES, Acting P. J.



WILEY, J.

11